UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| STEVES AND SONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NICK SCOTT COPELAND, <br> STIER SUPPLY COMPANY, <br> JONATHAN "RYAN" STIER, <br> RYAN STEAD, <br> KORADOOR, LLC, and <br> TKI, INC. <br><br> Defendants. | Civil Action No. 2:24-cv-07015-BHH <br><br> Jury Trial Demanded |

## VERIFIED COMPLAINT

COMES NOW Steves and Sons, Inc. ("Steves"), Plaintiff in the above-styled action, and respectfully states its Complaint against Defendants Nick Scott Copeland ("Copeland"), Stier Supply Company ("SSC"), Jonathan "Ryan" Stier ("Stier"), Ryan Stead ("Stead"), KoraDoor, LLC ("KoraDoor"), and TKI, Inc. ("TKI") (collectively, "Defendants") as follows:

## PRELIMINARY STATEMENT

This lawsuit arises from a year-long misappropriation campaign led by two of Steves' former employees and officers, Copeland and Paul Allen ("Allen")[1]. While serving as Vice Presidents for Steves, Copeland and Allen accepted the fiduciary duties of care, loyalty, and good

---

[1] Prior to the filing of this Complaint, after receiving cooperation from Allen to identify what confidential information had been misappropriated, who it was shared with, returning the misappropriated information to Steves, agreeing to additional restrictions concerning his ability to compete with Steves, and providing an affidavit to Steves admitting to his conduct as alleged in this Complaint among other confidential terms, Steves reached a settlement agreement with Allen. As such, while Allen is not a named party, the details of his conduct are relevant and necessary to fully understand the scope and nature of the conspiracy and scheme undertaken by the Defendants. Allen's actions, in concert with the Defendants, provide essential context and demonstrate the full extent of the misappropriation, unfair competition, and breaches alleged herein. **Exhibit A (Affidavit of Paul Allen).**

faith, including honesty and sincerity. However, Copeland and Allen actively engaged in a scheme of self-dealing and deception as they used their positions for their personal gain at the expense of Steves.

This scheme involved conspiring with Defendants Stier, SSC, KoraDoor, Stead, and TKI to steal Steves' trade secrets and confidential information. Collectively, they used this information while providing confidential information, trade secrets, and know-how to start a competing business to Steves known as KoraDoor, created business plans, set pricing, made sales pitches to Steves' customers, and developed plans to create their own manufacturing plant, among other things. After misappropriating confidential and trade secret information that Steves had developed over multiple generations of ownership, Defendants projected that KoraDoor's revenue would soon reach $22,000,000.00, which benefitted Defendants at Steves' expense and harmed other Steves customers competing directly with SSC. While effectuating their scheme, Defendants attempted to conceal their illicit activities from Steves as they deliberately communicated amongst themselves outside the Steves email domain using personal Gmail accounts, and separate accounts set up by TKI to subvert detection.

Defendants' misconduct, however, goes beyond the misappropriation of Steves' trade secrets and confidential information. The meals, trips, and golf outings where Allen, Copeland and the other Defendants devised their scheme were fraudulently expensed to Steves under the guise of "business" expenses. Knowing that they were deceiving Steves into paying for these trips to plan their competing venture, Copeland sent the following text:

> **Paul [Allen] is in Istanbul. Can he write your name on his expense report? Wait, how is he going to submit that now?** 😑 �con

Copeland and Allen also made efforts to take care of their co-conspirator Stier (and ultimately themselves), by fabricating a revised supply agreement with SSC (who was and still is one of

Steves' customers) that increased the Rebate Rate by 60%. The fraudulently increased Rebate Rate resulted in Steves *retroactively* paying SSC an additional $209,000.00 in 2023 alone. In return, SSC promised to pay Allen and Copeland $90,000.00 each over 18 months, plus $26,250.00 per month to "wait out their non-compete" through the term of the KoraDoor "consulting agreement".

For these reasons, among many more which are described in more detail below, Steves seeks injunctive relief barring Copeland from further breaching his agreement with Steves, requiring specific performance of those agreements, requiring the Defendants to return all of Steves' confidential information in their possession, custody, or control, and requiring them to identify to whom they disclosed any of Steves' confidential or trade secret information. Steves further seeks actual and punitive damages against the Defendants, and recission of the fraudulent supply agreement requiring Steves to do business with SSC—a customer that Steves previously valued and trusted.

Steves is steadfast in its commitment to fostering honest competition and providing its customers with a wide range of choices within the marketplace. Steves welcomes a competitive environment, which drives innovation and benefits everyone. But that commitment does not require Steves to tolerate actions that impede fair competition and cause harm to Steves and its customers. The consequences of the Defendants' misconduct extend far beyond quantifiable damages; worse, their wrongdoing results in immeasurable harm to Steves (by undermining Steves' ability to trust its own officers) and Steves' customers (by unfairly distorting the competitive landscape to SSC's advantage).To protect its confidential, proprietary and trade secret information, its reputation, and its customers, and recover from Defendants for the harm they have caused, Steves is compelled to bring this action to pursue all available legal remedies against the Defendants.

## THE PARTIES

1.      Steves is a Texas corporation headquartered in Texas. For purposes of 28 U.S.C. § 1332(a), Steves is a citizen of Texas. Steves is a manufacturer and supplier of doors which are distributed throughout the United States to retailers and wholesalers.

2.      Copeland is a citizen of Georgia, residing at 4281 Spring Branch Circle, Valdosta, GA 31601. Copeland was a former employee and officer of Steves.

3.      SSC is South Carolina corporation with its principal place of business located at 303 Bellinger Lane, Gaston, South Carolina 29053. For purposes of 28 U.S.C. § 1332(a), SSC is a citizen of South Carolina. Pursuant to a long-term Supply Agreement between SSC and Steves, SSC purchases interior molded door products from Steves.

4.      Stier is a citizen of South Carolina, residing at 7 Dalton Street, Daniel Island, South Carolina 29492. Stier is the president of SSC.

5.      Stead is a citizen of Florida, residing at 523 Lake Avenue, Orlando, Florida 32801.

6.      KoraDoor is South Carolina limited liability company, whose principal place of business is located at 240 Seven Farms, Unit 201, Charleston, South Carolina 29492. For purposes of 28 U.S.C. § 1332(a), Steves is a citizen of South Carolina. KoraDoor was formed by Copeland, SSC, Stier, and Stead with the intent of supplying and ultimately manufacturing interior and exterior doors in competition with Steves.

7.      TKI is a North Carolina Corporation, whose principal place of business is located at 3912 Battleground Ave., Suite 112205, Greensboro, NC. For purposes of 28 U.S.C. § 1332(a), Steves is a citizen of North Carolina. TKI is supplier of imported millwork products who was previously a supplier of Steves.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over the federal Defend Trade Secrets Act under 18 U.S.C. § 1836(e) and 28 U.S.C. § 1331.

9.     This Court has jurisdiction of the state law claims under 28 U.S.C. § 1367(a) because it has original jurisdiction over the federal claims and the state law claims form part of the same case under Article III of the United States Constitution.

10.     This Court also has subject matter jurisdiction over all claims asserted herein under 28 U.S.C. § 1332(a) because Steves and Defendants are citizens of different states and the matter in controversy exceeds $75,000 exclusive of interests and costs.

11.     This Court has personal jurisdiction over Copeland under South Carolina Code § 36-2-803 because Steves' claims against Copeland arise from Copeland transacting business, contracting to supply services, and committing tortious acts in South Carolina.

12.     This Court has personal jurisdiction over SSC under South Carolina Code § 36-2-802 because it is organized under the laws of South Carolina and has its principal place of business within this State.

13.     This Court has personal jurisdiction over Stier under South Carolina Code § 36-2-802 because he is domiciled in South Carolina.

14.     This Court has personal jurisdiction over Stead under South Carolina Code § 36-2-803 because Steves' claims against Stead arise from Stead transacting business, and committing tortious acts in South Carolina.

15.     This Court has personal jurisdiction over KoraDoor under South Carolina Code § 36-2-802 because it is organized under the laws of South Carolina and has its principal place of business within this State.

16.     This Court has personal jurisdiction over TKI under South Carolina Code § 36-2-803 because Steves' claims against TKI arise from TKI transacting business, contracting to supply goods, and committing tortious acts in South Carolina.

17.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this judicial district or, if it is determined that § 1391(b)(2) does not apply, under § 1391(b)(3) because one or more defendants is subject to the Court's personal jurisdiction with respect to this action.

## FACTUAL BACKGROUND

**A.     Steves' Business & Its Reliance on Confidential Information and Trade Secrets**

18.     Founded in San Antonio, Texas in 1866 by a German immigrant, Steves, a family business now in its sixth generation, has manufactured and supplied high quality, reasonably priced doors for generations of American consumers.

19.     Steves manufactures doors in Texas, Virginia, Tennessee, and Utah and sells them to customers in 40 states from which they are distributed throughout the United States. Currently, end-users in all 50 states and the District of Columbia rely on doors manufactured by Steves.

20.     Steves' customers include retailers that sell directly to consumers, as well as wholesalers that sell to other businesses, including home builders.

21.     Typically, Steves enters into long-term agreements ("LTAs") with its customers. Steves negotiates each LTA separately and maintains as confidential each agreement's specific terms, including pricing for individual door styles, minimum volumes, rebates, and other key terms.

22.     If these details were to become generally known to Steves' customers and competitors in the market, it would harm Steves economically by diminishing Steves' negotiating

ability for new LTAs and amendments to existing LTAs. At the same time, it would increase the negotiating ability of Steves' competitors.

23.    Steves also expends significant funds each year staying informed about and conducting analyses of the markets important to its business to develop its business strategies. If the results of these analyses were to become generally known, it not only would represent expenditures that existing and potential competitors could avoid, allowing those competitors to deploy their own funds to make them more competitive with Steves, but would also give those competitors insights into Steves' business strategies, enabling them to counter those strategies more effectively.

**B.     Allen Executes Agreement with Steves**

24.    Allen applied for employment with Steves in December 2009 after his former employer, Crest (a steel and fiberglass door manufacturer) merged with Steves.

25.    The Application for Employment contained an agreement that, if hired, Allen would be bound by certain legal obligations in exchange for Steves providing him compensation, training, the use of Steves' materials and property, and access to certain confidential information, as defined in the agreement. That definition specifically stated that the confidential information included certain trade secrets that Steves developed and used, and that Steves had spent time, effort, and money to develop the confidential information and desired to protect its investment in the confidential information.

26.    Allen executed the agreement (the "Allen Agreement") on December 2, 2009. **Exhibit 1.**

27.    Under the terms of the Allen Agreement, Allen agreed not to compete, directly or indirectly, with the business conducted by Steves during his employment with the company and within reasonable temporal and geographic limits after termination of that employment. He also

agreed not to accept employment with a competitor to Steves within reasonable temporal and geographic limits after termination of his employment with Steves.

28.     Under the terms of the Allen Agreement, Allen agreed not to use or disclose any of the confidential information to anyone outside of Steves, either during his employment or at any time thereafter except in connection with his employment by, and for the benefit, of Steves. In particular, he further agreed not to copy, reproduce, or remove confidential information from Steves' premises.

29.     Under the terms of the Allen Agreement, Allen agreed that "the Company would be irreparably harmed if [he] violated any of the covenants in this Agreement or if any of these covenants were not specifically enforced." He further agreed that "in the event of a breach or threatened breach of any of the covenants … the Company shall have the right, if it so chooses, to obtain relief in any court of competent jurisdiction to enjoin [him] from breaching or further breaching this Agreement, to obtain specific performance of this Agreement, to obtain monetary compensation for damages sustained as a result of breaches of this Agreement and to recover the attorney's fees and costs and expenses incurred by the Company as a result of [his] breach or threatened breach of this Agreement."

30.     In June 2021, Allen executed an acknowledgement that he understood and was in compliance with Steves' confidentiality policies.

31.     Steves fulfilled its obligations under the Allen Agreement. During his 14+ years of employment, Steves paid Allen hundreds of thousands of dollars every year in compensation, provided Allen with training, provided him the use of company materials and property (including company-owned computers and cell phones), and gave him access to Steves' confidential information for the purpose of performing the duties of his employment duties. This protected information included custom data reporting systems developed specifically for Steves, granular

access to Steves costs to the SKU level, Steves' supplier pricing, customer lists, as well as detailed sales volumes and other highly sensitive commercial information.

32.     During the time he was employed with Steves, Allen served in increasingly prominent roles, culminating in being elected as a trusted company officer by the Steves board as Vice President – Sales South Central from 2013 to 2017, followed by Vice President - Business Development from 2017 until his departure.

33.     In his final role with Steves, Allen had access to at least the following Steves confidential information, including trade secrets: customer-specific pricing, pricing strategies, supply agreements, market strategies, growth strategies, material costs and suppliers, strategic plans Steves developed to support its customers requiring molded door skins, and specific specifications of Steves plans to manufacture molded door skins.

**C.     Copeland Executes Agreement with Steves**

34.     Copeland began his employment with Steves in June 2013.

35.     In November 2019, Steves, having realized that it could not locate a signed agreement with Copeland, requested that Copeland complete an employment application that included Steves' standard agreement with its employees at that time. In exchange for entering into certain legal obligations to Steves, Steves agreed to pay, and did pay Copeland a significant, mutually-agreed-upon incentive payment.

36.     Copeland executed the agreement (the "Copeland Agreement") on December 3, 2019. **Exhibit 2.**

37.     Under the terms of the Copeland Agreement, Copeland agreed not to compete, directly or indirectly, with the business conducted by Steves during his employment with the company and within reasonable temporal and geographic limits after termination of that

employment. He also agreed not to accept employment with a competitor to Steves within reasonable temporal and geographic limits after termination of his employment with Steves.

38.    The Copeland Agreement also prohibited Copeland from using or disclosing any of Steves' confidential information, either during his employment or at any time thereafter except in connection with his employment by, and for the benefit of, Steves. He further agreed not to copy, reproduce, or remove confidential information from Steves' premises.

39.    In June 2021, Copeland executed an acknowledgement that he understood and was in compliance with Steves' confidentiality policies.

40.    During the time he was employed with Steves, Copeland served in increasingly important roles, culminating in being elected a trusted company officer by the Steves board as Vice President – Sales.

41.    In that role, Copeland had access to the following Steves confidential information, including trade secrets: pricing, pricing strategies, supply agreements, market strategies, growth strategies, custom data reporting systems developed specifically for Steves, granular access to Steves costs to the SKU level, Steves' supplier pricing, customer lists, as well as detailed sales volumes and other highly sensitive commercial information.

**D.    Allen and Copeland Begin Planning to Start a Competing Business**

42.    On information and belief, between Fall 2022 and Spring 2023, Allen and Copeland started planning to form a competing business.[2] During this time, Copeland attended a golf outing in Charleston, South Carolina with Stier, the president of SSC, one of Steves' largest customers in

---

[2] After Copeland and Allen resigned their employment in March 2024, Steves obtained the information contained in paragraphs 18 through 89 by imaging Allen's devices and email account, reviewing expense reports, and analyzing audit logs for 0365 content.

that market. Not long after that trip, Copeland then attended a golf outing with Stead in Orlando, Florida. Two weeks later, on April 15, 2023, Allen and Stead texted as follows:

> **Allen:**    **I flipped this to Nick the other day…are you ready to be a disrupter? [sending a link to an article about how "it's possible for a handful of people. . . to take down a 6 billion dollar category leading company"]**
>
> **Stead:**    **I'm ready!**
>
> **Allen** :    🟠 😌

While alone, these communications and events are seemingly innocuous, the communications that subsequently occurred in May of 2023 indicate that Allen, Copeland, Stier, and Stead were working together to start a door manufacturing business to compete with Steves.

43.    On May 2, 2023, Allen, Copeland, Stier, and Stead met at the Congaree Golf Club in Ridgeland, South Carolina, which was expensed to Steves. Three days later, Stier sent the following email to Allen, Copeland, and Stead:

> **Here you go boys. I am pretty wide open for the next 8 days if anyone wants to collaborate. My main focus is to get around to see places to get me on your page.**
>
> **[Let's Fucking Go],[3]**
>
> **Ryan Stier**
> **CEO**
> **Stier Supply Company**

Stier attached a spreadsheet titled "X Co Project Tracker" to his email. **Exhibit 3.** This document provided action items for each of the four individuals to perform in furtherance of their goal of starting a competing door manufacturing business.  Specifically, the X Co Project Tracker directed (1) Allen and Copeland to create a "Business Plan and Proforma for Interior Doors" (products that

---

[3] The email sign off reads "LFG," which is an acronym for "Let's Fucking Go."

Steves manufacturers and sells), (2) Allen to obtain "More info on Exterior product" (products that Steves manufacturers and sells), and (3) Copeland to arrange a "TKI meeting," prepare a "supply agreement" with TKI (who is customer of Steves), and create a "Private Label-Name" for their competing business. Stead was in charge of creating a "Business Plan and Proforma for Exterior Doors and work with Stier on obtaining Millwork Sales and setting up "another distributor trip."

44.     Wasting no time, two days later, Copeland replied to the May 5, 2023 email from Stier attaching notes for "[his] part" of the business ("Copeland's Notes"):

| Message | |
| --- | --- |
| **From:** | Nick Copeland [ncopeland01@gmail.com] |
| on behalf of | Nick Copeland <ncopeland01@gmail.com> [ncopeland01@gmail.com] |
| **Sent:** | 5/7/2023 6:23:29 PM |
| **To:** | Paul Allen [paul.allen150@gmail.com] |
| **CC:** | Ryan Stier [ryanstier@stiersupply.com]; rtstead@hotmail.com |
| **Subject:** | Re: X Co Project Tracker |
| **Attachments:** | Notes.docx |

Attached are the notes for my part.

On Fri, May 5, 2023 at 6:59 PM Paul Allen <paul.allen150@gmail.com> wrote:
  LFG is right!!!

  On Fri, May 5, 2023 at 3:20 PM Ryan Stier <ryanstier@stiersupply.com> wrote:
    Here you go boys. I am pretty wide open for the next 8 days if anyone wants to collaborate. My main focus is to get around to see places to get me on your page.

    LFG,

    **Ryan Stier**

    CEO

    Stier Supply Company

"Copeland's Notes" is a two-page document titled "SSC DOOR Manufacturing Consideration w/NC notes." Copeland's Notes addressed (among other things) the manufacturing capacity of Steves, stated that the "market is primed for a new supplier," proposed they create two interior door manufacturing facilities each manufacturing 8,000 doors a day, and stated that Copeland and Allen are reviewing their non-competition and trade secrets agreements. Additionally, Copeland's Notes included confidential and highly sensitive information about Steves' business. **Excerpts**

**from Copeland's Notes that are not deemed highly confidential or trade secret include the following:**

> Why does the market need a new supplier
>
> - The market doesn't "need" a new supplier. The market is primed for a new supplier. The market is primed for CHOICE
> - Someone needs to take advantage of the opportunity to be a "non"-brand
>
> Any supplier currently for sale…. Who where and why
>
> - No supplier that we know of
>
> What size plant are you proposing?
>
> - Facility 1: 8K doors/day (Start with 1)
> - Facility 2: 8K doors/day
>
> ***
>
> Why do this now….reaction of current suppliers….how will they react with new market competitor
>
> - Let's have a call to discuss this
> - **Ryan to Supply list of current vendors
>
> Any special considerations in industry with non-competition agreement and trade secrets agreements…
>
> - Nick and Paul working on this piece independently

Copeland's Notes contain multiple pieces of information that are highly confidential to Steves, including Steves' assessment of the size of the door market across multiple variables, the market door manufacturing capacity, and the markets served by various manufacturers.

45.     Stead responded by email on May 10, 2023, providing a document titled "Start Up Exterior Thoughts," working off Stier's list regarding the "exterior door side of things." Stead referenced a meeting with TKI and sales figures he received from Copeland. **Exhibit 4.** The following day on May 11, 2023, Stead indicated there was a plan for the group to meet with TKI.

46.     On May 13, 2023, Allen emailed Copeland, Stier, and Stead to provide guidance and thoughts on distribution for their new competing company. **Exhibit 5.**

47.     Expense reports submitted to Steves from Allen and Copeland show that they traveled to Atlanta for what was supposed to be Steves business on May 18, 2023. However, a text exchange between Allen, Copeland, and Taimur Kahn of TKI on that same day shows that they were furthering their own competing business interests[4]:

> **TKI:**          **Good seeing you guy – I was a bit lit**
> **"2 drink rule"**
>
> **Copeland:**     **Love it! Thank you for making the journey.**
> **3 "drank" rule 🟠 😌**
>
> **Allen:**        **Always fun to share time together regardless of**
> **the number of drinks. Many thx for the**
> **opportunity to visit.**
> **#grateful**
>
> **TKI:**          **Likewise guys – the opportunity is there for us to**
> **milk, I cannot do it alone. I need the US side**
> **entity ..and together we can pick it all**

48.     A few days later, Allen emailed Copeland, Stier, and Stead to update the group on the progress of the competing business, indicating that he and Nick had been talking to the "market" about the Defendants' business plans. The "market" would undoubtedly consist of Steves' existing and potential customers—meaning, while acting as Steves' Vice President of Business Development and Vice President of Sales, Allen and Copeland (respectively) were actively undermining Steves by talking to existing and potential customers about offering them an alternative to Steves. Allen's email—using Gmail accounts instead of the Steves email domain—further indicates that Allen and Copeland's expensed trip to Atlanta was for their own benefit and not that of Steves:

---

[4] Taimur Kahn's name in Allen's phone is "TBS" which Steves learned from Allen in a meeting after his resignation means "The Bar of Soap" referring to him being "slippery."

| Message | |
|---|---|
| From: | Paul Allen [paul.allen150@gmail.com] |
| on behalf of | Paul Allen <paul.allen150@gmail.com> [paul.allen150@gmail.com] |
| Sent: | 5/21/2023 9:29:52 AM |
| To: | Nick Copeland [ncopeland01@gmail.com] |
| CC: | Ryan Stier [ryanstier@stiersupply.com]; Ryan Stead [rtstead@hotmail.com] |
| Subject: | Re: X Co Project Tracker |

Morning gents,

Nick has continued to gather market solid market intel (SKUs, price points, volumes, etc). He and I have been priming the pump with the market for desire with regards to alternative options in the FG market. We have getting resounding feedback that our opportunity is real time. Very encouraging.

We were also able to meet with Taimur. He is committing to support us and laid out some of the things he needs to be able to do so in a way that presents no interruption to the customer commitments. All seems to be doable and realistic.

49.     The following day, on May 22, 2023, Copeland provided TKI with an outline for a supply agreement between "Casper," the initial name they came up with for their competing company,[5] and TKI. The supply agreement provided that TKI would provide Casper with 200,000 door slabs annually:

**Supply Agreement for TKI**

1. Quantity                 200,000 slabs annually
   a.  Threshold for productivity
2. Stock Lead Times         5 weeks
3. Can Lean Time            8 weeks
4. Terms                    50% up front 50% upon delivery (first 12 months)
5. Rebate                   2%
6. Co/op                    1%
7. The Exit                 12 months with 180-day notice
8. Pricing                  24 month hold-no more than 5% change in pricing
9. Force Majeure            supersedes pricing agreement
10. Warranty                Limited Lifetime
11. Ratings/Testing         FL
12. Future Endeavors w/Casper

50.     On May 23, 2023, Allen sent a text to Copeland formally suggesting that the official entity name of their competing business should be "CASPER LLC" and that the principal's name

---

[5] The name was later changed from Casper to KoraDoor.

and title should be "NICK COPELAND" as "VP." Copeland responded "It's a start. I flipped this to Ryan Stier as well." In a later text message that Copeland sent later that day, which included TKI, Copeland clarified that the named principal of their competing business should be Stier instead of himself.

51.     From late May through the summer of 2023, Copeland, Allen, Stier, and TKI regularly communicated and met on multiple occasions to develop their competing business, which included (without limitation) a fiberglass distribution company in Florida. On May 31, 2023, Stier indicated that he set up a tour of seven door manufacturing plants (including a tour of one of Steves' plants)—presumably to gather information for their competing business and planned to take the Defendants' business plan to the SSC Board in June. Allen was tasked with working on the TKI supply agreement while Stead worked on the proforma and toured warehouse spaces in Florida. On June 19, 2023, Copeland flew to Orlando to meet with Stead, then flew from Orlando to Nashville to meet with Stier. In July, Copeland sent revisions to an excel workbook titled "Casper Calculations" in which he anticipated the Defendants selling their products to multiple existing customers of Steves, including SSC. On July 18, 2023, Copeland, Stier, and Allen had a Teams meeting, followed by Stier further revising the Casper Calculations workbook before sending it back to Copeland and Allen and asked, "confirm you can go to market at this price." In early August 2023, Copeland had dinner and lunch with Stier in Charleston, South Carolina (both of which he expensed to Steves). **Exhibit 6**.

52.     In late August 2023, SSC's CFO, Dan Gallagher, using information provided to him by Allen and Copeland, put together financial projections for the Defendants' competing company, **projecting that within only a few years Casper's revenue would be over $22,000,000.00**.

53.    From September 24-26, 2023, Allen and Copeland traveled to Charleston to meet with Stier. While there, they attended a golf tournament and a party with Stier. Stead was clearly aware of the plan for Allen and Copeland to meet with Stier because he texted Allen, "I hope you & Nick are spending lots of time planning my future today." Even though Allen and Copeland were in Charleston meeting with Stier in furtherance of their own competing business venture, they again expensed this trip to Steves. **Exhibit 7**.

54.    In November 2023, Copeland and Allen continued to work on a supply agreement for TKI. The agreement was sent to SSC's attorney for review and revisions. On November 17, 2023, Taimur Khan of TKI texted Allen and Copeland stating:

> **pls keep the Hutt discussion to yourselves (I hope Ryan does too). I don't want Uncle Sam[6] to know his target came and told me. Plus I don't want there to be a perception that TKI and Steves have domestic issues. Want to remain underwater…a happy   smily   [sic]   friendly   submarine…good   with everyone…but carry a mean nuclear war head.**

The following day, TKI sent a text to Allen, Copeland, and Stier indicating the four recently met in person, stating:

> **Gentlemen – good seeing each of you, and great meeting you in person Ryan.**
>
> **Becca will have temp emails created for ea[ch] of you under one of TKI brands either Metierz or MaisonAlyn – she will send log in information.**
>
> **Again, to keep all communication separate.**

At the time Taimur Khan of TKI sent this message, both Allen and Copeland were still employed by Steves as officers of the company, and had active non-compete, non-solicitation, and confidentiality agreements. These communications with TKI, Allen, and Copeland show that TKI

---

[6] "Uncle Sam" apparently referred to Sam Steves, the Steves President/COO at the time Copeland sent the text.

was aware of the Defendants' nefarious efforts to start a competing business and that TKI was involved in trying to cover up the Defendants' actions.

55.    On December 12, 2023, Allen, who sensed Copeland becoming uncomfortable with their decision to start a competing company, sent the following email to Copeland to encourage him to continue to move forward:

---

**Message**

| | |
|---|---|
| **From:** | Paul Allen [paul.allen150@gmail.com] |
| **on behalf of** | Paul Allen <paul.allen150@gmail.com> [paul.allen150@gmail.com] |
| **Sent:** | 12/12/2023 8:56:53 AM |
| **To:** | Nick Copeland [ncopeland01@gmail.com] |
| **Subject:** | Items to think about |

1) timing- it's up to you. The date can move, but it's important to set one
2) structure- some of this will be determined by how the business is formed…LLC or C corp or etc
3) tie breaker- how are these decisions made? One idea could be basketball possession arrow. ☺

I'm sensing your uneasiness. I need you to be vocal. If your uneasiness is based on the future structure, let's talk it through. We need to get it all on the table. If you're uneasiness is around the fact of leaving the old and starting the new. Let's talk about that. But this limbo world isn't going to get us moving forward.

Love you brother.

---

Shortly thereafter, on December 28, 2023, Casper, LLC was officially formed. The Articles of Incorporation shows that the initial designated office was located at 240 Seven Farms Drive, Suite 201, Daniel Island, South Carolina 29492. **Exhibit 8**. This address, according to public records, is owned by SSC.

56.    From January to February 2024, Allen, Copeland, TKI, and Stier continued working on the TKI supply agreement and Allen and Copeland traveled to Charleston again to meet with Stier, which was expensed to Steves (though it is unlikely they were there advancing Steves' business interest).

57.    In early March 2024, Copeland traveled to Orlando to golf with Stead and have dinner with Stier. Both golf and dinner included a senior executive from an important strategic partner and customer of Steves, and who the Defendants were targeting as part of their competing

business. This trip was also expensed to Steves. On March 15, 2024, Casper, LLC's name was changed to KoraDoor, LLC via an amended Articles of Incorporation filed with the South Carolina Secretary of State. **Exhibit 9**.

58.     On March 21, 2024, SSC's CFO, Dan Gallagher sent Copeland and Allen the KoraDoor Consulting Agreement, which precipitated their resignation. **Exhibit 10**.

**E.     Allen and Copeland Resign and Wipe Company-Owned Devices**

59.     One day after receiving the KoraDoor consulting agreement, Copeland and Allen resigned from Steves. Copeland noticed his resignation from Steves on Friday, March 22, 2024, alleging that he needed a temporary respite from work obligations to attend to urgent family matters. Allen also noticed his resignation from Steves on Friday, March 22, 2024, claiming that it had nothing to do with Copeland's departure and that his decision to leave was a "conscious uncoupling."

60.     On March 25, 2024, Steves emailed Copeland to inform him that his last day with the company would be March 25, 2024, but that Steves would continue to pay him through April 6, 2024. In the same email, Steves reminded Copeland of his obligations regarding Steves' confidential information, as well as his non-competition and non-solicitation obligations, and instructed Copeland to return all company data, documents, and devices by the end of the day. On the same day, Steves terminated Copeland's ability to access company email and computer systems.

61.     Because Steves was not aware Allen had been conspiring with the other Defendants to start a competing business for the twelve months leading up to his resignation, Steves requested that Allen remain with the company for a short period of time to assist with transitioning his job responsibilities to other employees. On March 27, 2024, Steves emailed Allen to inform him that his resignation would be effective April 5, 2024, but that Steves would continue to pay him—both

salary and bonus compensation—through April 30, 2024. In the same email, Steves reminded Allen of his obligations regarding Steves' confidential information, as well as his non-competition and non-solicitation obligations and instructed Allen to return all company data, documents, and devices on or before April 5, 2024.

62.    On April 5, 2024, Steves terminated Allen's ability to access company email and computer systems. During the period between his resignation and termination of his access to company systems, Allen accessed Steves' confidential and trade secret information on multiple occasions, including downloading more than 1,600 files to an unidentified device.

63.    When Copeland and Allen returned their company-owned laptops and cell phones, Steves' IT department determined that their hard drives and cell phones had been factory reset. By initiating this factory reset, Copeland and Allen attempted to prevent Steves from (1) reviewing their activity on the devices, and (2) determining whether Steves' confidential information had existed on, or may have been transferred from, the devices before these actions were taken. This conduct directly violated Steves' explicit instructions to Copeland and Allen to return all company data, documents, and company-owned devices by their last day of employment. Neither Copeland nor Allen informed Steves of their intent to wipe or reset their company-owned devices before returning them to Steves.

**F.    Steves Discovers Evidence of Exfiltration of Its Confidential and Trade Secret Information**

64.    Because of the close proximity of Allen's and Copeland's resignations, information that Steves received at the time of those resignations, and the deliberate deletion of company data from the company-owned devices returned by Allen and Copeland, Steves engaged forensic experts to assist it in investigating Allen's and Copeland's electronic and communications footprints on Steves' systems during the months leading up to their resignations.

**Allen's Activities**

65.    In December 2023, Allen used an external drive to backup or store files. Allen did not return the external drive to Steves when he departed. Further, Allen's use of a personal external storage device (USB drive, jump drive, thumb drive, etc.) violates Steves' Cyber Security and Confidentiality Policy, which prohibits employees from transferring data from company-owned equipment to personal equipment.

66.    On December 4, 2023, Allen forwarded to his personal Gmail account an internal email exchange containing confidential information related to Steves' plans to expand business with one of its customers.

67.    On December 12, 2023, Allen changed the email linked to his Dropbox account from his Steves email address to a personal Gmail address. This change enabled him to transfer company documents outside the company through Dropbox without the files being identifiable in Steves' account audit logs.

68.    Artifacts recovered from Allen's laptop indicate that he accessed a Dropbox site the same day that he changed the email linked to the Dropbox account. The artifacts also indicate that he used the laptop to access his personal Gmail account, Google Drive, Yahoo mail, and personal OneDrive. All of these activities would enable the exfiltration of confidential data while making the exfiltration difficult to detect, especially once the hard drive was wiped.

69.    In the month preceding his resignation, Allen repeatedly accessed files containing confidential and trade secret company information, including information related to customer rebates, sales data, inventory data, material cost data, pricing information, capacity utilization.

70.    In February and March 2024, he also repeatedly accessed an electronic dashboard containing some of the most up-to-date sensitive information in the company regarding sales and pricing.

71.     On March 25, 2024, just a few days after noticing his resignation, Allen accessed several documents on OneDrive that contained Steves' confidential and trade secret information.

72.     On March 29, 2024, Allen again accessed several documents on OneDrive that contained Steves' confidential and trade secret information. Further, he downloaded at least 1,617 files from his OneDrive to an unidentified computer. Some of these files, which were a compilation of emails, agreements, presentations, sales reports, price comparisons, and other documents, contained significant pieces of confidential company information. No business need existed for Allen to download such a large amount of confidential company information one week after he noticed his resignation, and he did not return this downloaded set of documents to the company upon his departure.

73.     Allen continued to access company confidential information from his Steves OneDrive account, including customer statistics, customer rebate information, inventory data, and a supply agreement right up to the day before his account access was terminated.

**<u>Copeland's Activities</u>**

74.     On at least three occasions between October and November 2023, Copeland forwarded Steves' confidential agreements with its customers to his personal email account.

75.     In the final month before he noticed his resignation, Copeland accessed multiple times a week a document that reflects the number of trucks of product being sent to each Steves' customers, thereby reflecting Steves' sales to those customers. He also continued to access certain agreements with Steves' customers.

76.     Like Allen, Copeland repeatedly accessed Steves' internal electronic dashboard containing some of the most up-to-date sensitive information in the company regarding sales and pricing during the final two months of his employment.

### G.     Allen, Copeland, and Stier Anticipated Consequences of their Conduct

77.     After Allen and Copeland's departure, Steves discovered two PowerPoint presentations: (1) a slide deck prepared by both Allen and Copeland titled "What I would Want to Know" that outlined Steves' confidential information and know-how, market data, costs, pricing, necessary equipment, personnel structure, warehouse capacity, and goals for their competing company, and (2) a slide deck called "Prestidigitation" prepared by Copeland, which set out ways Allen and Copeland could earn a fee from Stier during their non-competition periods. Towards the end of the presentation, Copeland cautions:

> **Don't get sued!!!**
> **Focus on building KORA**
> **Exposer [sic] is a fixed number**

78.     Steves also learned that Stier specifically knew and anticipated the impact KoraDoor would have on existing vendors. In an email exchange from May 2023, Copeland asks Stier to send the short list of vendors that he and Allen should consider "in terms of defense, offense or all around sensitivity." Stier responded as follows:

Message

| | |
|---|---|
| **From:** | Ryan Stier [ryanstier@stiersupply.com] |
| **on behalf of** | Ryan Stier <ryanstier@stiersupply.com> [ryanstier@stiersupply.com] |
| **Sent:** | 5/21/2023 3:43:31 PM |
| **To:** | Nick Copeland [ncopeland01@gmail.com] |
| **CC:** | Ryan Stead [rtstead@hotmail.com]; paul.allen150@gmail.com |
| **Subject:** | RE: X Co Project Tracker |

Below would be the vendors that I believe this could effect

Huttig
Reeb
Woodgrain
Masonite
Steves
Excel
Thermatru

79.     Additionally, in December 2023, Stier sent Allen a PowerPoint presentation regarding Casper/KoraDoor that included a specific slide titled "**Risks**." In that slide, Stier anticipates a "competitive response from Steir's suppliers" and states "Stier's scale would make it difficult for retaliation from exterior door supplier." Cognizant of Allen and Copeland's noncompetition agreements with Steves, Stier also advises "operate stealthy."

## H.     Allen and Copeland Admit to Possession of Steves' Information

80.     Based on the facts discovered during its investigation, Steves, to protect its confidential and trade secret information, issued cease and desist letters to Allen and Copeland. **Exhibit 11 and Exhibit 12.** Although both Allen and Copeland, through their respective counsel, denied any wrongdoing, they both also admitted to being in possession of Steves' confidential information. In addition to the cease and desist letters, to protect Steves' confidential information following its misappropriation by Allen and Copeland, Steves informed SSC and Stier (and other entities with whom Allen and Copeland had interacted in relation to this misappropriation) that both Allen and Copeland remained bound by their duty to maintain the confidentiality of such information. **Exhibit 13.**

81.     In response to Steves' cease and desist letter, Allen admitted that, as part of transferring his cell number to his new cell phone before factory resetting his Steves-supplied cell phone, he transferred text messages and photos that included communications with Steves' customers to the new phone. Allen remains in possession of those text messages and photos. He also retains access to his Dropbox account used during his employment with Steves.

82.     During follow-up discussions with Steves' counsel, Allen admitted that Copeland approached Allen, Stier, and TKI about a business opportunity involving fiberglass exterior doors (a product that Steves sells) in mid-2023, which fell through because Stier and TKI could not reach an agreement. Allen never reported these discussions to Steves during his employment.

83.     Most notably, Allen further admitted that Stier is paying Allen $26,250.00 a month[7]. Stier also agreed to pay Allen three bonus payments of $30,000.00 ($90,000.00 total).[8] This amount perfectly matches the compensation package contained in the KoraDoor Consulting Agreement, which SSC's CFO sent to Allen *and* Copeland. This admission is consistent with the following texts exchanges between Allen, Copeland, and SSC's CFO, Dan Gallagher on June 3, 2024:

> **Dan Gallagher:**        **Wires on their way to you**
>
> **Nick Copeland:**        **Thank you Sir!**

SSC's CFO sent a similar text to Allen and Copeland a month later, on July 3, 2024:

> **Dan Gallagher:**        **U both get paid?**
>
> **Nick Copeland:**        **Yessir! Thank you!**
>
> **Paul Allen:**        **Yes sir**

84.     In response to Steves' cease and desist letter, Copeland admitted that "on occasion" he emailed information from his Steves email account to his personal email account for ease of access. In addition, he "may have" taken screen shots of Steves' electronic dashboards (which contain sensitive pricing and sales information) for certain Steves' customers.

85.     Regarding Copeland's Notes, Copeland admits he met with an executive from one of Steves' customers in May 2023—almost a year before he resigned from Steves—"wherein a discussion took place over the possibility of creating a door manufacturing operation"—an activity that would have violated his non-compete obligations to Steves. Copeland made no attempt to

---

[7] The funds are paid through DT Marlin, LLC. DT Marlin, LLC's registered agent is Haley Stier, Stier's wife, and whose business address is listed at 7 Dalton Street, Daniel Island, South Carolina 29492, Stier's residence.

[8] As of December 1, 2024, Allen has received one $30,000.00 bonus payment.

explain his note indicating that Nick and Paul were working independently on "[a]ny special considerations in industry with non-competition agreement and trade secrets agreements…" Further, Steves' audit of available OneDrive logs shows that Copeland accessed this file on at least February 19, 2024 and March 17, 2024, several months after the alleged meeting date.

86.     In response to Steves' correspondence, Stier's counsel simply pointed out that Stier is a Steves customer and "noted" Steves' concerns. **Exhibit 14.**

**I.     Copeland and Stier Amend and Backdate SSC's Supply Agreement with Steves**

87.     Steves and SSC have conducted business under LTAs, which require (1) Steves to supply a certain amount of product to SSC, and (2) SSC to purchase a certain amount of product from Steves. Over time, certain LTA provisions were negotiated and modified, such as the payment terms of the agreement, the amount of notice required for termination, and the percentage Steves paid to SSC as a Volume Commitment Rebate ("Rebate Rate"). The Rebate Rate is an annual percentage Steves paid to SSC as an incentive for achieving or exceeding its Purchase Commitment ("Rebate Payments").

88.     On March 6, 2022, Copeland and Stier signed a new LTA that, among other things, extends the term of the LTA through December 31, 2024 and increased SSC's Rebate Rate (the "March 2022 LTA").

89.     In July 2022, Stier requested to renegotiate the terms of the LTA for fear of the "looming slowdown" in the housing market. Copeland, Stier, and SSC's attorney exchanged revisions to the LTA. SSC's attorney circulated the last draft, which included a 60 days' termination notice provision (reduced from 12 months), payment by SSC in 60 days (increased from 30 days), while keeping the Rebate Rate the same as the March 2022 LTA.

90.     On November 4, 2022, Stier emailed a copy of a revised LTA containing all the revisions from the July 2022 draft. The subject line of the email read "Signed." However, Stier

dated the agreement February 27, 2022—which would have been one week prior to the execution of the March 2022 LTA. There was no indication that Copeland or anyone else at Steves signed and returned this version.

91.    In December 2023, while Copeland and the Defendants were in the midst of starting their competing business, Copeland—for the first time—notified Steves' accounting department that the Rebate Rate had been increased and made retroactive to January 1, 2023. This change resulted in Steves owing SSC 60% more in Rebate Payments for 2023 than the amount provided under the March 2022 LTA. Accordingly, Steves' accounting department, at Copeland's direction, issued a check to SSC for an additional $209,000.00.

92.    Copeland never provided Steves with a copy of an LTA reflecting this increased Rebate Rate. When Steves management became aware of the increased Rebate Rate, they asked SSC for a copy of the LTA reflecting that change. In response, Stier sent a version that included the increased Rebate Rate and other revised terms, such as a 60-day termination notice provision and 60-day payment provision (the "Fraudulent LTA"). The Fraudulent LTA was purportedly signed by Copeland and Stier on September 7, 2022—impossibly, two months before Stier sent a version that acknowledged the original Rebate Rate on November 4, 2022. In short, Stier and Copeland reengineered a Supply Agreement that caused Steves to pay SSC fraudulently induced Rebate Payments, which effectively helped fund the monthly payments and bonuses SSC paid Copeland and Allen to compete with Steves. Steves never approved this increased Rebate Rate for SSC.

## COUNT ONE
## DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836) VIOLATION
## (AGAINST ALL DEFENDANTS)

93.    Steves incorporates by reference and realleges all preceding paragraphs of its Complaint as if fully restated herein.

27

94.     Steves manufactures, sells, and distributes doors used in interstate commerce across the United States.

95.     Steves has legal or equitable title to, and the right to enforce rights in, information related to the production, sale, and distribution of the doors used in interstate commerce.

96.     The information owned by Steves at issue here includes financial, business, and economic information, including but not limited to its market analyses, customer lists, contractual details with customers, product pricing, product sourcing details, product specifications, and manufacturing processes.

97.     Steves took reasonable measures to keep the information secret by (i) entering into agreements with it employees obligating them not to use or reveal the trade secrets for any purpose except in connection with their employment by, and for the benefit, of Steves; (ii) limiting access to the trade secrets to individuals in the company who needed to know them to perform their jobs; (iii) entering into agreements with its suppliers and customers not to disclose Steves' information outside of their relationship to Steves; (iv) storing the information in electronic locations accessible only to Steves' employees with a job-related need to access it through the use of unique username and password protections.

98.     The information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, persons who could obtain economic value from the disclosure or use of the information. If Steves' current or potential suppliers, customers, or competitors obtained the information, it would increase their bargaining power relative to Steves, thereby enhancing their economic position at the expense of Steves' economic position.

99.     During his employment with Steves, Copeland was informed of, and should have reasonably known from the circumstances (including the language in his employment agreement)

that Steves' trade secrets were confidential and that he had a duty not to disclose any trade secrets without Steves' express permission.

100.   Copeland and Allen acting in concert with the other Defendants, willfully misappropriated Steves' trade secrets, including but not limited to, its market analyses, customer lists, contractual details with customers, product pricing, product sourcing details, product specifications, and manufacturing processes.

101.   Copeland, Allen, and the other Defendants then used these trade secrets to set up KoraDoor in an effort to compete with Steves and undercut its position in the market, all for their own benefit.

102.   SSC, Stier, Stead, KoraDoor, and TKI knew the information that Copeland and Allen misappropriated and provided to them were trade secrets and that they had a legal obligation to refrain from using this information without Steves' permission.  This is evidenced by the great lengths that Defendants took to conceal their actions, including setting up KoraDoor in secret, as well as Stead, Copeland, and Allen all being set up with TKI emails so they could continue their scheme with less risk of detection by Steves.

103.   Defendants misappropriation of Steves' trade secrets was willful and malicious as it was in violation of the Copeland agreement (of which all Defendants were aware of), and because the misappropriation occurred during Copeland's and Allen's employment while they had access to Steves' trade secret information, which they and the other Defendants then used to set up a competing business (KoraDoor).

104.   As a direct and proximate result of Defendants' willful and malicious misappropriation of Steves' trade secrets, Steves has been damaged in an amount to be proven at trial.  Steves is also entitled to and seeks exemplary damages and attorneys' fees as a result of Defendants' willful and malicious conduct.

105.    Additionally, Steves is entitled to and seeks preliminary and permanent injunctive relief to prevent any further actual or threatened misappropriation, use, or disclosure of its trade secrets.

### COUNT TWO
### SOUTH CAROLINA TRADE SECRETS ACT (S.C. CODE § 39-8-10 *et seq*) VIOLATION (AGAINST ALL DEFENDANTS)

106.    Steves incorporates by reference and realleges all preceding paragraphs of its Complaint as if fully restated herein.

107.    Steves is the lawful and exclusive owner of its trade secrets (as that term is defined under S.C. Code Ann § 39-8-10 *et seq.*) which includes information related to the manufacturing, sales, marketing, pricing, sourcing, and distribution of its products, as well as the contractual terms with its customers, which individually are trade secrets, or together form a compilation trade secret.

108.    Steves took reasonable measures to keep the information secret by (i) entering into agreements with it employees obligating them not to use or reveal the trade secrets for any purpose except in connection with their employment by, and for the benefit, of Steves; (ii) limiting access to the trade secrets to individuals in the company who needed to know them to perform their jobs; (iii) entering into agreements with its suppliers and customers not to disclose Steves' information outside of their relationship to Steves; (iv) storing the information in electronic locations accessible only to Steves' employees with a job-related need to access it through the use of unique username and password protections.

109.    The information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, persons who could obtain economic value from the disclosure or use of the information. If Steves' current or potential suppliers, customers, or competitors obtained the information, it would increase their bargaining

power relative to Steves, thereby enhancing their economic position at the expense of Steves' economic position.

110.    During his employment with Steves, Copeland was informed of, and should have reasonably known from the circumstances (including the language in his employment agreement) that Steves' trade secrets were confidential and that he had a duty not to disclose any trade secrets without Steves' express permission.

111.    Copeland acting in concert with the other Defendants, willfully misappropriated Steves' trade secrets, including but not limited to, its market analyses, customer lists, contractual details with customers, product pricing, product sourcing details, product specifications, and manufacturing processes.

112.    Copeland, Allen, and the other Defendants then used these trade secrets to set up KoraDoor in an effort to compete with Steves and undercut its position in the market, all for their own benefit.

113.    SSC, Stier, Stead, KoraDoor, and TKI knew the information that Copeland and Allen had misappropriated and provided to them were trade secrets and that they had a legal obligation to refrain from using this information without Steves' permission.  This is evidenced by the lengths that Defendants took to conceal their actions, including setting up KoraDoor in secret, as well as Stead, Copeland, and Allen all being set up with TKI emails so they could continue their scheme with less risk of detection by Steves.

114.    Defendants misappropriation of Steves' trade secrets was willful and malicious as it was in violation of the Copeland Agreement (of which all Defendants were aware of), and because the misappropriation occurred during Copeland's and Allen's employment while they had access to Steves' trade secret information, which they and the other Defendants then used to set up a competing business (KoraDoor).

115. As a direct and proximate result of Defendants' willful and malicious misappropriation of Steves' trade secrets, Steves has been damaged in an amount to be proven at trial.

116. Steves is also entitled to and seeks exemplary damages and attorneys' fees as a result of Defendants' willful and malicious conduct.

## COUNT THREE – BREACH OF CONTRACT
## (AGAINST COPELAND)

117. Steves incorporates by reference and realleges all preceding paragraphs of its Complaint as if fully restated herein.

118. The Copeland Agreement constitutes a valid contract between Steves and Copeland for an exchange of value for services. The statements set forth in the Application for Employment provided to Copeland in November 2019 along with Steves' request that he accept them in exchange for an incentive payment constitute an offer. Copeland's execution of the agreement on December 3, 2019 constitutes his acceptance. Steves' provision of the incentive payment, and Copeland's promise to be bound by legal obligations set forth in the agreement constitute consideration.

119. Steves fully performed its obligations under the terms of the contract. Steves paid Copeland the agreed-upon incentive payment.

120. Copeland breached his agreement with Steves by retaining and disclosing Steves' confidential and trade secret information and competing with Steves while he was still a Steves employee and within 12 months following the end of his employment with Steves.

121. Steves suffered damages proximately caused by Copeland's breach, the amount of which will be proven at trial.

## COUNT FOUR – BREACH OF CONTRACT ACCOMPANIED BY A FRAUDULENT ACT (AGAINST COPELAND)

122.    Steves incorporates by reference and realleges all preceding paragraphs of its Complaint as if fully restated herein.

123.    The Copeland Agreement constitutes a valid contract between Steves and Copeland for an exchange of value for services.

124.    Copeland breached his agreement with Steves by retaining and disclosing Steves' confidential and trade secret information, and by unlawfully competing with Steves during the course of his employment.

125.    Copeland breached his agreement with Steves' with the fraudulent intent to do so as he knowingly and intentionally conspired with Defendants to misappropriate Steves' confidential and trade secret information in violation of the Copland Agreement and then used that information to set up a competitor to Steves while still employed by Steves.

126.    At all relevant times, Copeland took measures to conceal his actions by communicating with Defendants on his personal devices that Steves did not have access to and by deleting evidence of his wrongdoing on his company devices.

127.    Additionally, and during the course of Copeland's breach, he falsely claimed that the expenses he incurred during golf outings, meals, and other meetings with Defendants were business expenses incurred on behalf of Steves when in fact these expenses were related to Defendants' planning and executing their scheme to misappropriate Steves' confidential and trade secret information and set up KoraDoor as a competitor to Steves.

128.    These fraudulent actions accompanied Copland's breach of his agreement with Steves.

129.    Steves suffered actual damages proximately caused by Copeland's actions in an amount be shown at trial.

130.    Steves is also entitled to and seeks punitive damages.

### COUNT FIVE – TORTIOUS INTERFERENCE
### WITH A CONTRACTUAL RELATIONSHIP
### (AGAINST SSC, STIER, STEAD, KORADOOR, AND TKI)

131.    Steves incorporates by reference and realleges all preceding paragraphs of its Complaint as if fully restated herein.

132.    Copeland and Allen had a valid employment contracts with Steves.

133.    SSC, Stier, Stead, KoraDoor, and TKI, were aware of Copeland's and Allen's employment agreements with Steves that prevented them from disclosing Steves' confidential information.

134.    SSC, Stier, Stead, KoraDoor, and TKI intentionally procured Copeland's and Allen's breaches of their employment agreements with Steves by requesting that Copeland and Allen provide them with Steves' confidential information in furtherance of their competing business.

135.    SSC, Stier, Stead, KoraDoor, and TKI acted without justification.

136.    Steves has suffered actual damages proximately resulting from SSC's, Stier's, Stead's, KoraDoor's, and TKI's conduct, the amount of which will be proven at trial.

137.    Steves is also entitled to and seeks punitive damages.

### COUNT SIX – CIVIL CONSPIRACY
### (AGAINST ALL DEFENDANTS)

138.    Steves incorporates by reference and realleges all preceding paragraphs of its Complaint as if fully restated herein.

139.    During the times alleged herein, Defendants knowingly and willingly agreed and conspired between themselves to orchestrate a scheme in which they intended to and did in fact misappropriate Steves' confidential and trade secret information for the purpose of setting up a competing business.

140.    Defendants engaged in several overt acts in furtherance of this conspiracy including participating in meetings to set up their competing business, concealing the true nature of their meetings from Steves by submitting false expense reports, setting up TKI email accounts to orchestrate their scheme without risk of detection by Steves, and coordinating efforts to determine what types of confidential and trade secret information they could obtain from Steves that would allow them to steal Steves' business.  Additionally, SSC paid Allen and Copeland for their efforts to misappropriate Steves' confidential and trade secret information.

141.    SSC, Stier, and Copeland additionally conspired to defraud Steves of $209,000.00 in the form of an additional Rebate Amount payable to SSC.  SSC, Stier, and Copeland engaged in the overt act of fabricating a revised LTA with SSC, which was then surreptitiously submitted to Steves resulting in Steves *retroactively* paying SSC an additional $209,000.00 in 2023 alone.

142.    Steves has suffered actual damages that are the proximate result of Defendants' conspiratorial actions, the amount of which will be proven at trial.

143.    Steves is also entitled to and seeks punitive damages as a result of Defendants' conspiracy.

## COUNT SEVEN – BREACH OF FIDUCIARY DUTY
## (AGAINST COPELAND)

144.    Steves incorporates by reference and realleges all preceding paragraphs of its Complaint as if fully restated herein.

145.    As a Steves officer, Copeland was fiduciary of Steves and owed it the duties of good faith, care. and loyalty. The duty of loyalty requires that while employed as an officer of Steves, Copeland must put Steves' interest above his own and not perform any acts that are in competition or adverse to Steves.

146.    Copeland violated his fiduciary duty of loyalty to Steves by misappropriating Steves' confidential information and trade secrets and by starting a business with the intent to compete with Steves.

147.    Further, Copeland provided SSC with an inflated Rebate Rate via the Fraudulent LTA that was never approved by Steves. Such increase in the Rebate Rate was not for the benefit of Steves, but rather, was for the benefit of SSC, Allen, and Copeland as it allowed Stier to pay Allen and Copeland to "wait out" their non-competes as described further above.

148.    Copeland was in violation of his duty of loyalty since at least April 2023 through the time that his employment with Steves ended on March 25, 2024.

149.    Steves suffered damages proximately caused by Copeland breaching his fiduciary duties, the amount of which will be proven at trial.

150.    Steves is also entitled to and seeks to recover punitive damages and the wages Steves paid to Copeland during the period he was disloyal to Steves, which was from April 2023 to March 2024 at a minimum.

## COUNT EIGHT – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (AGAINST SSC, STIER, STEAD, KORADOOR, AND TKI)

151.    Steves incorporates by reference and realleges all preceding paragraphs of its Complaint as if fully restated herein.

152.    Copeland owed the fiduciary duties of good faith, care, and loyalty to Steves.

153.    Copeland breached his fiduciary duty of loyalty to Steves.

154.     SSC, Stier, Stead, KoraDoor, and TKI knowingly participated in Copeland's breach of his fiduciary duty of loyalty to Steves by conspiring with Copeland and actively participating in the Defendants' scheme to misappropriate Steves' confidential and trade secret information for the benefit of their competing company.

155.     SSC and Stier further aided and abetted Copeland in breaching his fiduciary duties by providing the Fraudulent LTA to Steves that was never negotiated or approved by Steves.

156.     Steves suffered damages as a result of the conduct of SSC, Stier, Stead, KoraDoor, and TKI, the amount of which will be proven at trial.

157.     As a result of Defendants' actions, Steves is entitled to and seeks actual and punitive damages.

### COUNT NINE – DECLARATORY JUDGMENT
### (AGAINST SSC)

158.     Steves incorporates by reference and realleges all preceding paragraphs of its Complaint as if fully restated herein.

159.     Pursuant to 28 U.S.C. §§ 2201 *et seq.*, Steves seeks a declaratory judgment that the Fraudulent LTA is void as it was never authorized by Steves, and that it is unenforceable as a matter of law.

### COUNT TEN – FRAUD
### (AGAINST COPELAND, SSC, AND STIER)

160.     Steves incorporates by reference and realleges all preceding paragraphs of its Complaint as if fully restated herein.

161.     Copeland, SSC, and Stier knowingly misrepresented to Steves, through its submission of the Fraudulent LTA, that the Rebate Rate had increased, which was false because they knew Steves had not approved that change.

162.    Copeland, SSC, and Stier intended for Steves to rely on the Fraudulent LTA and Steves did rely on the Fraudulent LTA when it made additional Rebate Payments based on the increased Rebate Rate.

163.    Copeland also knowingly and falsely represented that expenses he incurred for meals, golf outings, and meetings where Copeland and the other Defendants were planning to misappropriate Steves' confidential and proprietary information and set up their competing business were "business expenses" attributable to Steves.

164.    Copeland intended for Steves to rely on these false expense reports and Steves did in fact rely on these false expense reports as it reimbursed Copeland for these expenses.

165.    Steves' reliance on these expense reports was reasonable as it had no way of knowing at the time that the real purpose for these meeting was for Copeland, Allen, and the other Defendants to misappropriate Steves' confidential and trade secret information so that they could form a competing business.

166.    Steves suffered damages as a result of Copeland's and the other Defendants' false representations, the amount of which shall be proven at trial.

167.    As a result of Defendants' fraudulent actions, Steves is entitled to actual damages, punitive damages, and recission of the Fraudulent LTA.

## COUNT 11 – UNJUST ENRICHMENT
### (AGAINST ALL DEFENDANTS)

168.    Steves incorporates by reference and realleges all preceding paragraphs of its Complaint as if fully restated herein.

169.     Defendants have misappropriated Steves' confidential and trade secret information and received the benefit of such without compensating Steves for that benefit.

170.    It is inequitable and unjust for Defendants to realize the benefit of Steves' confidential and trade secret information through these improper means.

171.    As such, as alternative form of relief to what Steves has requested in its previous Counts, Steves seeks compensation for the benefit Defendants received as a result improperly possessing and using Steves' confidential and trade secret information.

## COUNT 12 – PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF
### (AGAINST ALL DEFENDANTS)

172.    Steves incorporates by reference and realleges all preceding paragraphs of its Complaint as if fully restated herein.

173.    Steves seeks a preliminary and permanent injunction preventing any Defendant from possessing or using its confidential or trade secret information and requiring that any confidential or trade secret information in Defendants' possession be returned to Steves or destroyed.

174.    Additionally, Steves seeks an injunction requiring Defendants to submit their phones, electronic devices  (including their storage drives, network drives, computers, laptops, tablets, or any other device that Defendants use to communicate and keep electronically stored information ("ESI")) to a forensic specialist chosen by Steves to identify all documents or files containing or reflecting Steves' trade secrets or other confidential information, to deliver to Steves a copy of each document or file located and obtain or destroy all such remaining documents or files in their possession, custody, or control; and (2) an order that they provide a detailed account of the sharing with any third party of any Steves trade secret or confidential information, including the identity of the third party, when the information was shared, precisely what information was shared, how the information was shared, and what, if anything, they received in exchange for providing the information.

175.    Steves has met all of the requirements for this Court to grant the requested injunctive relief.  Moreover, the relief requested is permitted by the Defend Trade Secrets Act, South Carolina Trade Secrets Act, and common law.

176.    Steves has shown that it is substantially likely to succeed on the merits of its claims as it has included evidence with its Complaint establishing that Defendants have misappropriated and utilized its confidential and trade secret information in contravention and in breach of the Copeland Agreement and for the purpose of starting a business that would improperly compete with Steves.

177.    Steves will suffer irreparable harm, for which there is no adequate remedy at law, if Defendants are permitted to utilized and possess its confidential and trade secret information, as it derives a competitive advantage in the door manufacturing market through its use of this information and it runs the appreciable risk of losing that competitive advantage as well as suffering harm to its customer relationships if Defendants further use or disclose such information for their own benefit.

178.    The balance of equities also weighs in Steves' favor as the issuance of the requested injunction only requires Defendants to abide by the applicable trade secrets laws and the Copeland Agreement, while the failure to issue the injunction is likely to result in substantial and irreparable harm to Steves as articulated above.

179.    Finally, granting the requested injunctive relief furthers the public interest as the public has a strong interest in ensuring contracts are enforced and that confidential and trade secret information is protected from unlawful misappropriation.

## **PRAYER FOR RELIEF**

Wherefore, Steves requests that the Court grant it the following relief:

1.     Issue and order granting the injunctive relief requested in Counts One, Two, and Eleven.

2.     Award Steves its actual, compensatory, exemplary, and punitive damages it is entitled to pursuant to the claims asserted herein.

3.     Issue and order declaring that the Fraudulent LTA is void and unenforceable as a matter of law;

7.     Award Steves its reasonable attorneys' fees and costs in this action;

8.     Award Steves its pre-judgment and post-judgment interest; and

9.     Award such other relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Steves demands a trial by jury for all issues triable by a jury.

Dated:  December 3, 2024

Respectfully submitted,

By: /s/ *Wesley T. Moran*

NELSON MULLINS RILEY & SCARBOROUGH LLP
G. Mark Phillips
Federal Bar No. 3051
151 Meeting Street, Suite 600
Post Office Box 1806 (29402-1806)
Charleston, SC 29401-2239
Phone: (843) 853 - 5200
Email: mark.phillips@nelsonmullins.com

Wesley T. Moran
Federal Bar No. 12797
3751 Robert M Grissom Parkway
Myrtle Beach, South Carolina 29577-6412
Phone: (843) 946-5600
Fax: (843) 448-3437
Email: wes.moran@nelsonmullins.com

FORD MURRAY, PLLC
William H. Ford (to be admitted pro hac vice)
bill.ford@fordmurray.com
Veronica S. Wolfe (to be admitted pro hac vice)
veronica.wolfe@fordmurray.com
Kennedy Hatfield Asel (to be admitted pro hac vice)
hatsfield.asel@fordmurray.com
10001 Reunion Place, Suite 640
San Antonio, Texas 78216
Phone: (210) 731-6400

HUNTON & WILLIAMS LLP
Maya M. Eckstein (to be admitted pro hac vice)
meckstein@HuntonAK.com
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Phone: (804) 788-8200

*Attorneys for Plaintiff*

PIPKIN LAW
Marvin G.  Pipkin
10001 Reunion Place, Suite 6400
San Antonio, TX  78216
Telephone:     (210) 731-6495

*Of Counsel to Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| STEVES AND SONS, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>NICK SCOTT COPELAND,<br>STIER SUPPLY COMPANY,<br>JONATHAN "RYAN" STIER,<br>RYAN STEAD,<br>KORADOOR, LLC, and<br>TKI, INC.<br><br>    Defendants. | Civil Action No. _____<br><br>**VERIFICATION** |

I, Sam Bell Steves III, declare that I am the Chief Executive Officer of Steves and Sons, Inc. ("Steves") LLC, the Plaintiff in the above-captioned action. I declare that I have read the foregoing Verified Complaint; that I have personal knowledge of the matters contained therein; that the factual statements contained therein are true to the best of my knowledge, except those stated to be based upon information and belief, as to which I am informed and believe such matters to be true; and that the documents attached as exhibits thereto are true and correct copies of the originals identified therein.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 3, 2024.

[Sam Bell Steves III]