**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

STEVES AND SONS, INC.,

               Plaintiff,

    v.

NICK SCOTT COPELAND; STIER
SUPPLY COMPANY; JONATHAN
"RYAN" STIER; RYAN STEAD;
KORADOOR, LLC; and TKI, INC.,

               Defendants.

Civil Action No.  2:24-cv-07015-BHH

**PLAINTIFF STEVES AND SONS, INC.'S OPPOSITION TO
DEFENDANT TKI, INC.'S MOTION AND MEMORANDUM
IN SUPPORT OF MOTION TO DISMISS**

## TABLE OF CONTENTS

I.   INTRODUCTION .......................................................................................................... 1

II.  BACKGROUND ............................................................................................................ 3

    A.  Steves, Its Suppliers, and Its Employees ..................................................... 3

    B.  TKI's Early and Continued Involvement with the Scheme ........................... 4

    C.  Culmination of Scheme ................................................................................. 5

III. LEGAL STANDARDS ................................................................................................. 5

    A.  Motion to Dismiss for Lack of Personal Jurisdiction under Rule 12(b)(2) ................. 5

    B.  Motion to Dismiss for Failure to State a Claim under Rule 12(b)(6) .......................... 7

IV.  ARGUMENT ................................................................................................................. 8

    A.  Steves Has Made a Prima Facie Showing of Personal Jurisdiction over TKI ............. 8

        1.  This Court Has Traditional Specific Jurisdiction over TKI .................................... 8

            i.   TKI Has Purposefully Availed Itself of Conducting Business in
                South Carolina ............................................................................................ 9

                a.  Legal Principles Concerning Purposeful Availment ................................... 9

                b.  TKI's Contacts with South Carolina ........................................................ 11

                c.  TKI's Meritless Objections to this Court's Exercise of Personal
                   Jurisdiction ............................................................................................. 13

            ii.  TKI's Contacts with South Carolina Are Related to Steves's
                Claims ....................................................................................................... 18

            iii. It Is Constitutionally Reasonable for this Court to Exercise Personal
                Jurisdiction over TKI ................................................................................ 19

        2.  This Court Has Conspiracy Jurisdiction over TKI ................................................ 20

            i.   A Conspiracy Existed ................................................................................ 21

            ii.  TKI Participated in the Conspiracy .......................................................... 22

            iii. TKI's Co-Conspirators' Activity Had Sufficient Contacts with
                South Carolina .......................................................................................... 23

            iv.  TKI's Objections to Conspiracy Jurisdiction Are Meritless ......................... 23

    B.  Steves Has Adequately Pleaded Claims against TKI for Misappropriation of
       Trade Secrets and Civil Conspiracy ............................................................. 26

        1.  Misappropriation of Trade Secrets ....................................................................... 27

        2.  Civil Conspiracy ................................................................................................. 29

V.   CONCLUSION ............................................................................................................ 29

Plaintiff Steves and Sons, Inc. ("Steves"), by and through its undersigned counsel, hereby submits this opposition to the Motion and Memorandum in Support of Motion to Dismiss ("Motion") [ECF No. 18] filed by Defendant TKI, Inc. ("TKI"), seeking dismissal of the claims raised against TKI in Steves's Verified Complaint [ECF No. 1] (the "Complaint") under Rule 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure.

## I.  INTRODUCTION

TKI helped a South Carolina building materials supplier and two former employees of Steves misappropriate Steves's trade secrets and unlawfully start a competitor (Defendant KoraDoor, LLC, "KoraDoor") that was to be based in South Carolina.  Now, Steves seeks recovery from TKI and its co-conspirators for that misconduct, asserting six claims against TKI specifically:  violation of the federal Defend Trade Secrets Act (Count One); violation of the South Carolina Trade Secrets Act (Count Two); tortious interference with a contractual relationship (Count Five); civil conspiracy (Count Six); aiding and abetting a breach of fiduciary duty (Count Eight); and unjust enrichment (Count Eleven).[1]

In response to the verified allegations detailed in Steves's Complaint, TKI now argues that this Court cannot hold TKI to answer for its wrongdoings because this Court lacks personal jurisdiction over TKI.  TKI is incorrect.  As detailed below, this Court has specific personal jurisdiction over TKI for its intentional activities directed toward South Carolina, and Steves has satisfactorily pleaded causes of action against TKI for trade secret misappropriation, civil conspiracy, and other claims.[2]

---

[1] In Count Twelve of the Complaint, Steves also asserts its entitlement to preliminary and permanent injunctive relief against TKI.  (*See* Ver. Compl. ¶¶ 172–79.)

[2] In its Motion, TKI presents substantive 12(b)(6) challenges only to Count I, Count II, and Count VI of Steves's Complaint.  Thus, TKI apparently concedes that no objections provided under Rule 12(b)(6) exist as to Steves's other causes of action against TKI.  *See* Fed. R. Civ. P.

_**First**_, this Court has specific personal jurisdiction over TKI resulting from TKI's contacts with South Carolina and, separately, from the South Carolina activities of TKI's co-conspirators. TKI voluntarily chose to reach into South Carolina and help its customer, Stier Supply Company ("SSC"), and that customer's principle, Jonathan "Ryan" Stier ("Stier"), steal information from Steves through two of its former employees and use that information to start KoraDoor—a door manufacturing business headquartered in Daniel Island, South Carolina. TKI sent and received multiple communications with SSC and Stier, who were located in South Carolina. TKI also spent months negotiating for a supply agreement with KoraDoor (a company organized under South Carolina law and based in South Carolina). TKI even offered Stier and other defendants a TKI-brand email domain to carry out their scheme against Steves clandestinely. TKI's co-conspirators undertook even more activities in furtherance of their conspiracy from South Carolina—holding key meetings in Charleston and Ridgeland. TKI cannot escape this Court's power over it by discounting the jurisdictional significance of these acts. This Court has personal jurisdiction over TKI on Steves's claims under traditional notions of due process. But even if this Court were to lack specific jurisdiction over TKI under the traditional due process analysis focused on TKI's purposeful contacts with South Carolina, this Court _still_ would have personal jurisdiction over TKI as a co-conspirator to a conspiracy rooted in South Carolina activities. Thus, TKI's first basis for dismissal is meritless.

_**Second**_, Steves has satisfactorily pleaded its conspiracy and misappropriation claims against TKI. Indeed, Steves has pleaded in detail how TKI conspired with two South Carolina defendants (Stier and SSC) and others to start a new company in South Carolina that would unlawfully compete with Steves by utilizing its misappropriated trade secrets and other

---

12(b) (requiring defendants either to raise all defenses available under Rule 12(b) in a single motion or to waive them).

confidential information—transgressing the boundary between incidental competitive harms endemic to a market system into a malicious (and actionable) plan to injure Steves. Steves has also pleaded in detail how TKI's co-conspirators provided TKI with trade secret information about Steves's contract details, market analyses, manufacturing capacity, manufacturing processes and capabilities, customers, suppliers, distribution capabilities, and pricing—and how TKI stood to and did in fact benefit from its acquisition of these trade secrets. Thus, TKI's second basis for dismissal is equally meritless.

Accordingly, for the reasons detailed below, this Court should deny TKI's Motion in its entirety.

## II. BACKGROUND[3]

TKI is a North Carolina supplier of imported millwork products. (Ver. Compl. ¶ 7.) TKI was formerly a supplier for Steves. (*Id.*) Throughout 2023 and 2024, however, TKI partnered with a South Carolina customer of Steves to help it and former Steves employees establish KoraDoor—a competitor to Steves based in South Carolina.

### A. Steves, Its Suppliers, and Its Employees

Steves is a Texas-based door manufacturer. (*Id.* ¶ 18.) In late 2022, Stier and SSC, a large customer of Steves during the relevant time period laid out in the Complaint, participated in a misappropriation campaign with two of Steves's former officers, Nick Copeland ("Copeland") and Paul Allen ("Allen"), to establish a Steves competitor based in South Carolina ultimately named KoraDoor, LLC (originally called "Casper"). (*Id.* ¶¶ 42, 57.) TKI was included in this scheme from its early days. (*Id.* ¶ 43.)

---

[3] The allegations in the Complaint are verified and thus have the force of a sworn affidavit. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) ("[A] verified complaint is the equivalent of an opposing affidavit . . . when the allegations contained therein are based on personal knowledge.").

### B. TKI's Early and Continued Involvement with the Scheme

As early as May 2023, Stier, SSC, and the other conspirators planned to arrange a meeting with TKI and prepare a supply agreement with it. (*Id.*; *id.* Ex. 4, at 1 (referencing an upcoming meeting with TKI representative).) In fact, they held that meeting with Taimur Kahn, the President and CEO of TKI, on May 18, 2023 in Atlanta. (*Id.* ¶ 47.) TKI's president got "a bit lit" (*i.e.*, intoxicated) at that meeting and officially joined Stier, SSC and the other saboteurs to help them "milk" the "opportunity" and "pick it all." (*Id.*)

In late May 2023, TKI received an outline for a supply agreement with KoraDoor (still then called "Casper"). (*Id.* ¶ 49.) At that time, Stier himself was intended to be the named principal of Casper/KoraDoor—a fact communicated by text message one day after TKI received the initial outline for the supply agreement. (*Id.* ¶ 50.)

Throughout the summer of 2023, TKI met and regularly communicated with Stier and the other conspirators. (*Id.* ¶ 51.) Stier toured Steves's and other door manufacturers' plants, while Allen worked to prepare a TKI supply agreement. (*Id.*) Eventually, in November 2023, the TKI supply agreement was sent to SSC's attorney in South Carolina for review and revisions. (*Id.* ¶ 54.) In that same month, TKI's President and CEO texted some of TKI's co-conspirators about the need for continued subterfuge:

> I don't want there to be a perception that TKI and Steves have domestic issues. Want to remain underwater…a happy smily friendly submarine…good with everyone…but carry a mean nuclear war head.

(*Id.*) After an in-person meeting with its confederates, TKI arranged to set up Allen, Copeland, and Stier with TKI email addresses in a ploy "to keep all communication separate" from Steves systems. (*Id.*)

4

In late December 2023, KoraDoor (then still "Capser") was officially formed as a company organized under South Carolina law with its principal office on Daniel Island, South Carolina—specifically, on a property owned by SSC. (*Id.* ¶ 55.) Then, during January and February 2024, TKI continued working on the KoraDoor supply agreement with Stier and the other conspirators. (*Id.* ¶ 56.)

### C.  Culmination of Scheme

In March 2024, the conspiracy came to a head when Copeland and Allen—the two Steves employees involved with in the conspiracy—noticed their resignations from Steves. (*Id.* ¶ 59.) Their departures came one day after KoraDoor formally offered them a consulting arrangement—under which they received hundreds of thousands of dollars bankrolled by Stier from its South Carolina offices. (*Id.* ¶¶ 59, 83.)

## III.  LEGAL STANDARDS

TKI seeks dismissal for lack of personal jurisdiction under Rule 12(b)(2) and for failure to state a claim under Rule 12(b)(6).

### A.  Motion to Dismiss for Lack of Personal Jurisdiction under Rule 12(b)(2)

"The plaintiff's burden in establishing jurisdiction varies according to the posture of a case and the evidence that has been presented to the court." *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016). "[W]hen the court addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a *prima facie* showing of personal jurisdiction to survive the jurisdictional challenge."[4] *Id.* "When determining whether a

---

[4] Though courts sometimes apply a "preponderance of the evidence standard," they only can do so if they have held an "evidentiary hearing." *Grayson*, 816 F.3d at 268 ("[I]f a court requires the plaintiff to establish facts supporting personal jurisdiction by a preponderance of the

plaintiff has made the requisite *prima facie* showing, the court must take the allegations and available evidence relating to personal jurisdiction in the light most favorable to the plaintiff." *Id.*; *see also Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014) ("In considering whether the plaintiff has met this burden, the district court 'must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.'" (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989))); *Brabham Oil Co., Inc. v. Fuel Trader Supply, LLC*, 2024 WL 3567349, at *17 (D.S.C. July 29, 2024) ("At this stage of the litigation, the Court is convinced that it would be premature to grant [defendant]'s motion to dismiss due to a lack of evidence when the parties have not yet engaged in full discovery. All the Court must do at present is determine whether the Plaintiff's complaint is sufficient in light of its allegations, [defendant]'s affidavit, and Plaintiff's competing affidavit.").

"[A] court may compel or permit discovery to aid in its resolution of personal jurisdictional issues raised in a defendant's motion to dismiss." *Scardino v. Elec. Health Res., LLC*, 2014 WL 12606303, at *2 (D.S.C. Oct. 20, 2014). Where a plaintiff "offer[s] more than mere 'speculation or conclusory assertions,' or 'bare allegations in the face of specific denials,'" jurisdictional discovery can be warranted. *See id.* at *3; *see also Informaxion Sols., Inc. v. Vantus Grp.*, 130 F. Supp. 3d 994, 998 (D.S.C. 2015) ("[T]he Court concludes that jurisdictional discovery is warranted and would aid the Court in determining whether personal jurisdiction

---

evidence prior to trial, it must conduct an 'evidentiary hearing.'" (quoting *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 n. 5 (4th Cir. 2005))). Normally, the preponderance-of-the-evidence standard is appropriate after the plaintiff has conducted jurisdictional discovery. *See id.* at 269 ("Because full discovery had been conducted and the relevant evidence on jurisdiction had been presented to the court, the court appropriately considered the evidence and found the facts by a preponderance of the evidence."). TKI has not requested an evidentiary hearing here, and Steves has received no opportunity whatsoever to conduct discovery.

exists over Defendants."); *Poole v. Transcon. Fund Admin. Ltd.*, 2013 WL 12243970, at *3 (D.S.C. Aug. 7, 2013) (ordering jurisdictional discovery where plaintiff based specific jurisdiction on "these contacts:  three emails, a telephone call, and password-protected website access").

**B.  Motion to Dismiss for Failure to State a Claim under Rule 12(b)(6)**

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires complaints to set forth "a short and plain statement showing that the pleader is entitled to relief." *Milliken & Co. v. Evans*, 2016 WL 470017, at *2 (D.S.C. Feb. 8, 2016) (quoting Fed. R. Civ. P. 8(a)(2)).  Though Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," it "does not require 'detailed factual allegations.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, "[t]o survive a motion to dismiss," under Rule 12(b)(6), a complaint simply "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft*, 556 U.S. at 678).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft*, 556 U.S. at 678). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer *possibility* that a defendant has acted unlawfully." *Id.* (emphasis added) (quoting *Ashcroft*, 556 U.S. at 678).  Indeed, "[a] plausible but inconclusive inference from pleaded facts will survive a motion to dismiss." *Id.* (quoting *Sepulveda-Villarini v. Dep't of Educ. of Puerto Rico*, 628 F.3d 25, 30 (1st Cir. 2010)).

When resolving a Rule 12(b)(6) motion, the "court 'accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff.'" *Id.* (quoting *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009)).  "Rule 12(b)(6) 'does not

countenance dismissals based on a judge's disbelief of a complaint's factual allegations.'" *Id.* (original ellipses omitted) (quoting *Colon Health Centers of Am., LLC v. Hazel*, 733 F.3d 535, 545 (4th Cir. 2013)).

## IV. ARGUMENT

TKI argues that Steves's claims against it should be dismissed for two reasons. First, TKI argues that this Court lacks personal jurisdiction over it. Next, TKI argues that Steves fails to state claims for either civil conspiracy or misappropriation of trade secrets against it. Neither argument has merit.

### A. Steves Has Made a *Prima Facie* Showing of Personal Jurisdiction over TKI

TKI contests this Court's personal jurisdiction over it on the claims raised in Steves's Complaint. (Motion 6–15.) TKI's arguments are meritless. As demonstrated below, this Court can exercise specific personal jurisdiction over TKI in regard to Steves's claims against it.

#### 1. This Court Has Traditional Specific Jurisdiction over TKI

TKI first contests this Court's specific jurisdiction under the standard due process analysis. (Motion 6–12.) Courts may exercise specific jurisdiction[5] over a defendant when the plaintiff's claims relate to specific forum conduct of that defendant. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358–59 (2021). While general jurisdiction covers defendants "essentially at home" in the forum state, specific jurisdiction covers "defendants less intimately connected with a State" when they "deliberately 'reach[] out beyond' [their] home" into the forum state. *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)).

"Under specific jurisdiction, . . . a defendant may be sued in this Court if the litigation results from alleged injuries that arose out of or is related to the defendant's contacts with South

---

[5] Steves does not contend that TKI is subject to general jurisdiction in South Carolina.

Carolina, and those contacts were sufficient." *Toonder v. Cmty. Care Health Network, LLC*, 2021 WL 10050689, at *2 (D.S.C. Feb. 19, 2021). To determine if a defendant's claim-related conduct in the forum authorizes specific jurisdiction consist with due process,[6] courts assess (1) "the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state"; (2) whether the plaintiff's claims relate to those forum-related activities of the defendant; and (3) "whether the exercise of personal jurisdiction is constitutionally reasonable." *See Brabham Oil*, 2024 WL 3567349, at *12–13; *Ford*, 592 U.S. at 358–59 .

### i.  TKI Has Purposefully Availed Itself of Conducting Business in South Carolina

TKI argues that it lacks minimum contacts sufficient to authorize specific jurisdiction because it has not purposefully availed itself of South Carolina. TKI is wrong.

### a. *Legal Principles Concerning Purposeful Availment*

"[I]n determining whether a foreign defendant has purposefully availed itself of the privilege of conducting business in a forum state, we ask whether 'the defendant's conduct and connection with the forum state are such that [it] should reasonably anticipate being haled into court there.'" *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 559 (4th Cir. 2014) (quoting *Fed. Ins. Co. v. Lake Shore Inc.*, 886 F.2d 654, 658 (4th Cir. 1989)); *Poole v. Transcon. Fund Admin. Ltd.*, 2013 WL 12243970, at *2 (D.S.C. Aug. 7, 2013) ("A defendant has minimum contacts with a jurisdiction sufficient to subject it to specific jurisdiction in the forum state if 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" (quoting *World-Wide Volkswagen Corp. v. Woodson*,

---

[6] TKI concedes that "South Carolina's long-arm statute extends to the outer limits allowed by the Due Process clause." (Motion 6 (quoting *SouthStar Fin., LLC v. T-Zone Health, Inc.*, 2021 WL 5235223, at *2 (D.S.C. Nov. 10, 2021)).

444 U.S. 286, 297 (1990)).   In the business context, courts within the Fourth Circuit examine various factors:

> (1) "whether the defendant maintains offices or agents in the forum state;" (2) "whether the defendant owns property in the forum state;" (3) "whether the defendant reached into the forum state to solicit or initiate business;" (4) "whether the defendant deliberately engaged in significant or long-term business activities in the forum state;" (5) "whether the parties contractually agreed that the law of the forum state would govern disputes;" (6) "whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship;" (7) "the nature, quality and extent of the parties' communications about the business being transacted;" and (8) "whether the performance of contractual duties was to occur within the forum."

*Universal Leather*, 773 F.3d at 560 (quoting *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009)).   These factors are simply relevant areas of inquiry, not a balancing test; after all, "[t]he specific jurisdiction analysis does not require a specific number of contacts with the forum state to establish the requisite minimum contacts."  *Beocare Grp., Inc. v. Morrissey*, 124 F. Supp. 3d 696, 701 (W.D.N.C. 2015).   Nor is "the minimum contacts requirement . . . susceptible of mechanical application."  *Consulting Eng'rs*, 561 F.3d at 278; *see English & Smith v. Metzger*, 901 F.2d 36, 39 (4th Cir. 1990) ("The relevant question is not where the contacts predominate, but only whether enough minimum contacts exist that the district court's assumption of specific jurisdiction satisfied due process.").

Indeed, specific jurisdiction can be proper even where a majority of the *Consulting Engineers* factors weigh against a plaintiff.  *See Johnson v. Sky Media, LLC*, 2020 WL 1976312, at *3 (D.S.C. Apr. 23, 2020) (finding purposeful availment by defendant even after determining that majority of the Fourth Circuit's factors weighed against plaintiff), *report and recommendation adopted*, 2020 WL 5793355 (D.S.C. Sept. 29, 2020).  After all, courts focus on "the *quality* and *nature* of the defendant's connections, not merely the number of contacts between the defendant and the forum state."  *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344,

352 (4th Cir. 2020); *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 301 (4th Cir. 2012) (explaining that courts must "do more than formulaically count contacts."). And, ultimately, a nonresident's contacts with a state need only be "enough that he could 'reasonably anticipate being haled into court there'" for the conduct at issue in the action. *English & Smith*, 901 F.2d at 39 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

As a result, "a district court's exercise of personal jurisdiction over a particular defendant may rest upon limited contacts with the forum state"—even "a single act by a defendant can be sufficient to satisfy the necessary 'quality and nature' of such minimal contacts." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 293 (4th Cir. 2009) (explaining that, in *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223–24 (1957), the United States Supreme Court "recogniz[ed] jurisdiction on basis of defendant's single contact with forum state"); *Gracious Living Corp. v. Colucci & Gallaher, PC*, 216 F. Supp. 3d 662, 669 (D.S.C. 2016) ("Even a single contact with the forum state can create purposeful availment sufficient to satisfy due process requirements."); *Beocare Grp.*, 124 F. Supp. 3d at 701 (noting that the minimum contacts "test is so flexible that one act or contact within the forum state may be enough").

### b. *TKI's Contacts with South Carolina*

Here, TKI made the requisite contacts with South Carolina for a court to exercise jurisdiction over it in this case. TKI has participated in a conspiracy that had its central point of focus directed at South Carolina. Indeed, the entire purpose of the conspiracy was to open a door manufacturing business in South Carolina that would compete with Steves and would be supplied by TKI. Moreover, Stier and SSC were two of the central figures in that conspiracy—with whom TKI interacted and conducted business in furtherance of the conspiracy. TKI

repeatedly has sent communications to and received communications from SSC and Stier in South Carolina in perpetuating this conspiracy. TKI has met with Stier in his representative capacity for SSC to advance this conspiracy. TKI arranged for Stier, Copeland, and Allen to be set up with TKI email addresses so that they could deceive Steves. TKI spent months negotiating with the co-conspirators over a supply agreement with KoraDoor (then called Casper)—a company to be formed under South Carolina law and headquartered in Daniel Island, South Carolina that sought to unlawfully compete with Steves. TKI not only knew and expected that SSC and Stier would perform their parts of the conspiracy in South Carolina, but knew and expected that the entity ultimately called KoraDoor would operate from Daniel Island, South Carolina once established.

TKI cannot credibly contend that the activities detailed above do not count as minimally sufficient jurisdictional contacts with South Carolina. *See Cap. One Bank (USA), N.A. v. CareFree Debt, Inc.*, 2009 WL 10678203, at *3 (D.S.C. Jan. 9, 2009) (exercising specific jurisdiction over New York-based defendant in action filed in South Carolina by Virginia-based bank due to defendant's deceptive conduct toward two South Carolina customers of bank where defendant communicated and sent material to South Carolina customers)[7]; *BeoCare Grp.*, 124 F. Supp. 3d at 702 (exercising specific jurisdiction as well as conspiracy jurisdiction over nonresident defendant in action filed in North Carolina where defendant "repeatedly reached out to" a North Carolina company's employee). In sum, TKI established the minimum contacts with South Carolina necessary for specific jurisdiction when, over the course of several months, TKI

---

[7] *See* Compl. ¶¶ 7, 10, *Capital One Bank (USA), N.A., v. Carefree Debt, Inc.*, No. 0:08-cv-02274-JFA (D.S.C. June 19, 2008), ECF No. 1; Answer ¶¶ 8, 11, *Capital One Bank (USA), N.A., v. Carefree Debt, Inc.*, No. 0:08-cv-02274-JFA (D.S.C. June 19, 2008), ECF No. 46 (admitting citizenship allegations).

conspired with its South Carolina customer (SSC) and others to create and supply doors to KoraDoor (a South Carolina company) using Steves's misappropriated trade secrets.

<em>c.   TKI's Meritless Objections to this Court's Exercise of Personal Jurisdiction</em>

TKI advances meritless objections to this Court's specific jurisdiction in this case, arguing principally that its "contacts with South Carolina in this case are too attenuated and <u>de minimis</u> to support a finding of purposeful availment."  (Motion 7.)

First, TKI suggests that it "has not engaged in significant or long-term business activities in South Carolina," admitting that it sells products to SSC in South Carolina but insisting that these sales constitute only about 8% of its total sales.  (*Id.* at 8.)  But long-term business activity is unnecessary for specific jurisdiction because "even a single contact by a nonresident defendant may support a constitutional exercise of specific jurisdiction with respect to a claim arising from that contact, if the contact was purposefully aimed at the forum state, sufficiently egregious in impact."[8]  *Rosen v. Halperns' Steak & Seafood Co.*, 2019 WL 109327, at *4 (D.S.C. Jan. 4, 2019) (citing *First Am. First, Inc. v. National Ass'n of Bank Women*, 802 F.2d 1511, 1516 (4th Cir. 1986)); *Johnson*, 2020 WL 1976312, at *3 (exercising specific jurisdiction over defendant Minnesota magazine company where it communicated with South Carolina plaintiff promoted by plaintiff himself ("twelve emails" over five months), failed to reach any long-term agreement with him, yet unilaterally displayed his product in its magazine).  "While a single action or

---

[8] TKI's reliance on two unpublished opinions (one outside the District of South Carolina) is misplaced because they address facts unrelated to those here.  In *Berry v. Secure Relationship, LLC*, Judge Norton declined to exercise specific jurisdiction over a small, Montana-based LLC focused on relationship-therapy publications on claims against it arising from contract disputes with an independent contractor located in South Carolina, who had travelled to Montana for a discussion about their relationship.  2022 WL 16720115, at *1 (D.S.C. Nov. 4, 2022).   And in *Pet Specialties, LLC v. Navisiontech, Inc.*, the Middle District of North Carolina found that it lacked jurisdiction over a boutique Florida software company on a dispute with its "first and only customer in North Carolina" over a contract which defendant performed in Florida.  2019 WL 4773623, at *5 (M.D.N.C. Sept. 30, 2019).

13

transaction within a jurisdiction does not automatically subject a party to personal jurisdiction, courts have often found that a defendant has purposefully availed itself of the benefits of a forum based upon a single act or transaction with a plaintiff in that jurisdiction.  This is particularly true if the single transaction was a complicated transaction involving more than the mere exchange of money for goods or services, or if the transaction created some sort of ongoing obligation or relationship." *McNeil v. Sherman*, 2009 WL 3255240, at *5 (D.S.C. Oct. 7, 2009) (citation sentences omitted).  What's more, TKI's reliance on its percentage of South Carolina sales misapprehends the specific jurisdiction inquiry, as there is no authority to suggest a threshold amount of revenue must be derived from the forum state to exercise personal jurisdiction over a defendant.  *See Orangeburg Pecan Co. v. Farmers Inv. Co.*, 869 F. Supp. 351, 357 (D.S.C. 1994) ("Although Defendant has argued that the sales to South Carolina businesses did not comprise a significant portion of Defendant's annual revenues . . . , this court knows of no authority directing this court to apply a mere mathematical equation in the resolution of a delicate due process analysis governing personal jurisdiction.").

Next, TKI insists that it "does not maintain offices or agents in South Carolina."  (Motion 8.)  Such activity is unnecessary for specific jurisdiction.  *See Johnson*, 2020 WL 1976312, at *3 ("Indisputably, [the defendant] does not maintain offices or agents here and owns no property here."); *Toonder*, 2021 WL 10050689, at *2 (exercising specific jurisdiction over Floridian defendant where, *inter alia*, defendant allegedly induced plaintiff to work from home for a Florida company and reduced plaintiff's shares therein despite defendant having no "enduring relationship with South Carolina," having no "substantial, continuous, or systematic business or conducts in South Carolina," having "only communications with Plaintiff . . . via e-mail or in Florida," having no "offices or agents in South Carolina," having no "property in South

Carolina," and "never reach[ing] into South Carolina to solicit or initiate business"); *Grayson Consulting, Inc. v. Cathcart*, 2013 WL 6490175, at *5 (exercising specific jurisdiction over Cyprian-British company where, *inter alia*, it "ha[d] extensively communicated with at least one South Carolina resident regarding business transactions that [we]re implicated in th[e] litigation" despite "maintain[ing] neither an office nor an agent in South Carolina and own[ing] no property in the state").

TKI further insists that it did not initiate its participation in the conspiracy, stating instead that other Defendants "reached out to TKI." (Motion 8.) But "the Fourth Circuit has expressly stated that this factor alone is not determinative." *Johnson*, 2020 WL 1976312, at *3 (exercising specific jurisdiction despite defendant's argument that it "ha[d] presented unrefuted admissible evidence that the plaintiff initiated the first inquiry").

TKI also argues that it "did not travel to South Carolina to make in-person contact with a South Carolina resident." (Motion 8.) However, specific jurisdiction "may not be avoided merely because the defendant did not *physically* enter the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) ("[A] substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."); *Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 216 (4th Cir. 2001) ("A prospective defendant need not initiate the relevant 'minimum contacts' to be regarded as purposefully availing himself of the privileges of conducting activity in the forum state."); *In re Protected Vehicles, Inc.*, 429 B.R. 856, 862 (Bankr. D.S.C. 2010) ("The

15

defendant's activity need not have taken place within the forum . . . ."); *Manley v. Pro.
Disposables Int'l, Inc.*, 2023 WL 3325372, at *3 (D.S.C. May 9, 2023) (finding purposeful
availment in defendant's email and telephone communications with individuals inside South
Carolina); *McNeil*, 2009 WL 3255240, at *5 ("[E]ven if [defendant] never set foot in the state of
South Carolina, this does not preclude a finding that [defendant] had 'minimum contacts' with
the state.").

Additionally, TKI suggests that it "never finalized the supply agreement" with KoraDoor
and "never conducted any business with KoraDoor."  (Motion 8.)  Quoting *Burger King*, TKI
suggests that the unconsummated contract has no jurisdictional significance "because 'a
"contract" is ordinarily but an intermediate step serving to tie up prior business negotiations with
future consequences which themselves are the real object of the business transaction.'"  (*Id.*
(quoting *Burger King*, 471 U.S. at 478 (quoting *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313,
316–17 (1943))).  TKI has flipped this sensible proposition on its head; in fact, the original
*Hoopeston* quote (read in context) undercuts TKI's point entirely:

> The actual physical signing of contracts may be only one element in a broad range
> of business activities.  Business may be done in a state although those doing the
> business are scrupulously careful to see that not a single contract is ever signed
> within that state's boundaries.  Important as the execution of written contracts
> may be, it is ordinarily but an intermediate step serving to tie up prior business
> negotiations with future consequences which themselves are the real object of the
> business transaction.

318 U.S. at 317.  In other words, the nefarious negotiations and prefatory activities undertaken
by TKI with SSC and Stier in South Carolina are meaningful and material—and their

16

jurisdictional significance did not evaporate simply because the contract with KoraDoor was not finalized.[9]

Finally, TKI insists that, even if it had finalized the agreement with KoraDoor, it "never agreed that South Carolina law would govern." (Motion 8.) But agreement to a choice-of-law clause is not necessary. *See, e.g.*, *Johnson*, 2020 WL 1976312, at \*3 (exercising specific jurisdiction despite acknowledging that "[t]he record is silent about any contractual forum selection."); *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 133 (4th Cir. 2023) ("Though [defendant] does not maintain offices or property in [the forum state], and the choice of law factor is unclear, the remaining factors show that dBV purposefully availed itself 'of the privilege of conducting business under the laws of the forum state.'").

Accordingly, though TKI raises various objections to this Court's exercise of personal jurisdiction, none have merit. TKI established the minimum contacts with South Carolina necessary for specific jurisdiction when, over the course of several months, TKI conspired with Stier, SSC, and others to create a competitor to Steves using Steves's misappropriated trade secrets and then to supply KoraDoor with doors. To the extent that this Court does not find that Steves has met its burden at this stage, Steves respectfully requests the opportunity for jurisdictional discovery into any and all communications among and between TKI, Stier, SSC,

---

[9] If TKI's argument were accepted, a defendant could avoid answering for its tortious business activity in South Carolina so long as that activity preceded consummation of a contract—*e.g.*, pre-contract misrepresentations or fraudulent inducements. TKI's reliance on *Consulting Engineers* is misplaced. Critically, TKI here conspired with SSC and Stier in South Carolina (and other Defendants elsewhere) to establish a South Carolina-based door company using Steves's trade secrets; Steves now sues the conspirators in South Carolina for that conduct. Meanwhile, *Consulting Engineers* involved a "design project to be undertaken in India." *Consulting Eng'rs*, 561 F.3d at 275. The *Consulting Engineers* plaintiff sued Indian and Coloradoan defendants in Virginia after the Indian defendant hired the plaintiff's India-based employee in violation of non-disclosure agreements executed by the parties. *Id.* at 275–76. The Colorado defendant's agreement with the plaintiff even had a Colorado forum-selection clause. *Id.* at 280.

and any SSC personnel related to the claims at issue; into any and all communications among and between TKI and any other individual or entity located in South Carolina related to the claims at issue; into any and all trips taken by any TKI agent into South Carolina related to the claims at issue; and into any and all other activities of TKI involving South Carolina related to the claims at issue. *See Scardino*, 2014 WL 12606303, at *2.

### ii.  TKI's Contacts with South Carolina Are Related to Steves's Claims.

TKI also argues that Steves's claims are insufficiently related to TKI's contacts with South Carolina.  More specifically, TKI insists that the claims raised by Steves in this case "have no connection to TKI's sales to SSC," and TKI never mentions its conspiratorial conduct in its argument on relatedness.  (*See* Motion 11.)  TKI's argument is forceless.

As detailed above, TKI's planned supply of doors to KoraDoor was central to the conspiracy to unlawfully establish KoraDoor as a competitor to Steves.  Moreover, TKI assisted in the conspiracy to create KoraDoor using Steves's confidential and trade secret information, going so far as to agree to set up its co-conspirators with TKI email addresses so that the conspirators could conceal their efforts from Steves.  This conduct forms the precise basis of Steves's claims in the present action.  Thus, TKI cannot credibly contend that the relatedness element of specific jurisdiction is absent here.

Furthermore, TKI misapprehends the relatedness prong of specific jurisdiction.  TKI relies upon an outdated articulation of specific jurisdiction, suggesting that "the plaintiff's claim must <u>arise out of</u> those activities directed at the state" by a defendant.  (Motion 6 (emphasis added).)  But the United States Supreme Court recently clarified in *Ford* that specific jurisdiction only "demands that the suit 'arise out of *or relate to* the defendant's contacts with the forum.' . . . The first half of that standard asks about causation; but the back half, after the 'or,' contemplates

that some relationships will support jurisdiction without a causal showing." *Ford,* 592 U.S. at 361–62 (emphasis in original) (quoting *Bristol-Myers Squibb Co. v. Super. Ct. Cal., San Francisco Cty.*, 582 U.S. 255, 262 (2017)). Indeed, a "causation-only approach finds no support in [the Supreme Court]'s requirement of a 'connection' between a plaintiff's suit and a defendant's activities. . . . None of [the Supreme Court's] precedent has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do. . . . We have never framed the specific jurisdiction inquiry as always requiring proof of causation— *i.e.*, proof that the plaintiff's claim came about because of the defendant's in-state conduct." *Id.* Notwithstanding TKI's cursory assertions otherwise, TKI's long history of door purchases from SSC do relate to Steves's claims here. Though not strictly *causative* of Steves's claims, TKI's *relationship* with SSC forms the basis of TKI's conspiracy with SSC and Stier to start a South Carolina-based competitor to Steves. TKI's relationship with SSC thus directly relates to Steves's claims.

> iii.    It Is Constitutionally Reasonable for this Court to Exercise Personal Jurisdiction over TKI.

Finally, TKI argues that this Court's exercise over TKI would be "constitutionally unreasonable." (Motion 11.) TKI is again wrong.

"In determining whether jurisdiction is constitutionally reasonable, [courts] may evaluate [1] 'the burden on the defendant, [2] the forum State's interest in adjudicating the dispute, [3] the plaintiff's interest in obtaining convenient and effective relief, [4] the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and [5] the shared interest of the several States in furthering fundamental substantive social policies.'" *Christian Sci. Bd.*, 259 F.3d at 217 (quoting *Burger King*, 471 U.S. at 477). This "reasonableness analysis is designed to ensure that jurisdictional rules are not exploited 'in such a way as to make litigation "so gravely

difficult and inconvenient" that a party unfairly is at a 'severe disadvantage' in comparison to his opponent.'" *Id.* (quoting *Burger King*, 471 U.S. at 478).

From its home in North Carolina, TKI conspired with its South Carolina customer and others to create a South Carolina-based competitor to Steves using Steves's misappropriated trade secrets. TKI should have reasonably foreseen litigation in South Carolina for this activity, and the relevant factors all support this Court's exercise of specific jurisdiction over TKI. TKI will face little burden from litigation in South Carolina; after all, TKI's headquarters are but one state away in North Carolina, and TKI has retained South Carolina counsel. *See, e.g.*, *Johnson*, 2020 WL 1976312, at *1 (finding insufficient burden on Minnesota company). South Carolina has an interest in litigating this dispute—which involves three South Carolina defendants and hinges on a conspiracy based in South Carolina. Steves has a significant interest in obtaining convenient and effective relief in a single lawsuit, rather than being forced to litigate its claims piecemeal across multiple states. And similarly, the federal judicial system has a significant interest in avoiding duplicative proceedings in multiple states—raising unnecessary and avoidable issues of *res judicata* and issue preclusion, and doubling (or tripling) the risk of court intervention in discovery disputes. Finally, while the states have a shared interest in this action based on the federal trade secrets claims at issue, South Carolina has a particular interest based on the South Carolina-specific theories of recovery alleged in Steves's complaint (*e.g.*, recovery under the South Carolina Trade Secrets Act).

Accordingly, this Court's exercise of specific jurisdiction over TKI is constitutionally reasonable.

### 2. This Court Has Conspiracy Jurisdiction over TKI

TKI further contests this Court's specific jurisdiction under the alternative conspiracy

jurisdiction analysis.    (Motion 12–15.)    More specifically, TKI argues that conspiracy jurisdiction is inapplicable because Steves "cannot demonstrate that TKI has participated in the alleged conspiracy." (*Id.* at 12.)  Again, TKI is wrong.

"The Fourth Circuit recognizes the 'theory of obtaining personal jurisdiction by the showing of a conspiracy so that a conspirator not present in the forum State will, nevertheless, be adjudged to have had a personal presence in the forum State by means of adequate minimum contacts of the other conspirators therein.'" *Pro Slab, Inc. v. Argos USA LLC*, 2019 WL 4544086, at *17 (D.S.C. Sept. 19, 2019) (quoting *Lolavar v. de Santibanes*, 430 F.3d 221, 229 (4th Cir. 2005)).  "This theory for the exercise of personal jurisdiction requires the plaintiff to 'make a threshold showing that a conspiracy existed and that the defendants participated therein.'" *Id.* (quoting *Lolavar*, 430 F.3d at 229).  "To succeed under this theory, [p]laintiffs must 'make a plausible claim' (1) that a conspiracy existed; (2) [that the nonresident defendant challenging personal jurisdiction] participated in the conspiracy; and (3) [that] a co-conspirator's activities in furtherance of the conspiracy had sufficient contacts with South Carolina to subject that conspirator to jurisdiction in South Carolina." *Id.* (quoting *Unspam Technologies, Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013)).  Though a plaintiff cannot rely solely on "bare allegations," "the [p]laintiff's burden remains simply a prima facie showing that the elements of conspiracy theory of jurisdiction exist." *BeoCare Grp.*, 124 F. Supp. 3d at 702 (quoting *McLaughlin v. McPhail*, 707 F.2d 800, 807 (4th Cir. 1983)).

### i.  A Conspiracy Existed

Plaintiffs "must 'plead with particularity the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy.'" *Pro Slab*, 2019 WL 4544086, at *17 (quoting *Unspam*, 716 F.3d at 329).  Those elements are (1) "the combination or agreement of two or more persons," (2) "to commit an unlawful act or a lawful act by unlawful means," (3)

having "an intent to harm," (4) together with the commission of an overt act in furtherance of the agreement," and (5) "damages proximately resulting to the plaintiff." *See Paradis v. Charleston Cty. Sch. Dist.*, 433 S.C. 562, 574 & n.9, 861 S.E.2d 774, 780 & n.9 (2021).

As the Verified Complaint alleges, TKI combined with SSC, Stier, and other defendants to start a new company in South Carolina using trade secrets misappropriated from Steves— satisfying the first two elements detailed above. TKI had a malicious intent to harm Steves, as Steves has pleaded, satisfying the third element. (*See* Ver. Compl. ¶ 139 ("Defendants knowingly and willingly agreed and conspired between themselves to orchestrate a scheme in which they intended to and did in fact misappropriate Steves' confidential and trade secret information for the purpose of setting up a competing business.").) And TKI took acts in furtherance of its conspiracy with the other defendants in fulfilment of the fourth element. (*E.g.*, *id.* ¶¶ 54, 140.) And finally, as a direct result of that conspiracy, Steves suffered harms— satisfying the fifth element. (*See id.* ¶¶ 21–23.) Accordingly, at this pleading stage, TKI has made a *prima facie* showing that a conspiracy existed. *See BeoCare Grp.*, 124 F. Supp. 3d at 703; *Pro Slab*, 2019 WL 4544086, at *17.

### ii.    TKI Participated in the Conspiracy

As the Verified Complaint further alleges, and as detailed above, TKI participated significantly in the conspiracy. TKI helped its customer SSC and that customer's principle Stier in their efforts to assist two former Steves employees steal Steves's trade secrets that they utilized in making plans to start KoraDoor. TKI sent and received multiple communications with SSC and Stier, and it spent months negotiating for a supply agreement with KoraDoor. TKI even offered Stier and other defendants TKI email addresses to carry out their scheme against Steves clandestinely. Thus, Steves has made a *prima facie* showing of TKI's participation in the

conspiracy.  *See BeoCare Grp.*, 124 F. Supp. 3d at 703; *Pro Slab*, 2019 WL 4544086, at *17.

### iii.   TKI's Co-Conspirators' Activity Had Sufficient Contacts with South Carolina

The Verified Complaint also alleges, as detailed above, that TKI and its co-conspirators' activities in furtherance of their conspiracy centered in South Carolina.  Two critical members of that conspiracy—TKI's customer SSC and that company's principal Stier—played critical roles in stealing Steves's trade secrets from their home-base in South Carolina.  The critical early meetings between the co-conspirators in furtherance of the conspiracy took place in Charleston, South Carolina and Ridgeland, South Carolina.  (Ver. Compl. ¶¶ 42–43, 51.)  What's more, SSC, Stier, and their co-conspirators then utilized those trade secrets in making plans to start KoraDoor—a door manufacturing company organized under South Carolina law and to be based in South Carolina and headquartered on property owned by SSC in Daniel Island, South Carolina.  Accordingly, at this pleading stage, TKI has made a *prima facie* showing that TKI and its co-conspirators' activities in furtherance of their conspiracy had sufficient contacts with South Carolina to subject TKI to personal jurisdiction here.[10]  *See BeoCare Grp.*, 124 F. Supp. 3d at 703; *Pro Slab*, 2019 WL 4544086, at *17.

### iv.   TKI's Objections to Conspiracy Jurisdiction Are Meritless

TKI offers meritless objections to conspiracy jurisdiction and Steves's well-pleaded conspiracy claim against it.  First, TKI avers that Steves's Complaint fails to plead "that TKI acted 'with malice' or that TKI's objective was 'to ruin or damage the business of another'" because "TKI's only plausible motivation for considering the supply agreement [with KoraDoor] was to profit."  (Motion 13 (quoting *Waldrep Bros. Beauty Supp. v. Wynn Beauty Supp. Co.*, 992

---

[10] As set forth above in Section IV.A.1.ii, the conduct of TKI and its co-conspirators relate to Steves's claims here, and the exercise of jurisdiction over TKI would be constitutionally reasonable.

F.2d 59, 63 (4th Cir. 1993)).)  However, "[i]n a civil conspiracy claim, injury to the plaintiff need not be the *only* purpose behind the tortfeasor's conduct; many conspiracies will be at least partly motivated by the tortfeasor's desire to protect or benefit the tortfeasor's own lot." *Benedict Coll. v. Nat'l Credit Sys., Inc.*, 400 S.C. 538, 545, 735 S.E.2d 518, 522 (Ct. App. 2012) (emphasis added) (reversing trial court's dismissal of civil conspiracy claim).  Where "the primary purpose or objective of the combination is to injure the plaintiff," a claim for civil conspiracy lies, and "[a] combination of two or more persons wilfully to injure a man in his trade is unlawful and, if it results in damage to him, is actionable."  *Lee v. Chesterfield Gen. Hosp., Inc.*, 289 S.C. 6, 9, 344 S.E.2d 379, 381 (Ct. App. 1986) (citation omitted) (affirming trial court's denial of defendant's motion to dismiss where the "alleged purpose or object of the conspiracy [wa]s 'to dominate the practice of medicine by licensed physicians in Chesterfield County' and 'to restrain and eliminate, for their own financial advantage and professional enhancement, the element of fair competition' in the practice of medicine in Chesterfield County.'").

Here, the allegations of the Verified Complaint establish that TKI and its conspirators did not act out of some "general desire to make a profit."  *Compare SouthStar Fin., LLC v. T-Zone Health, Inc.*, 2021 WL 5235223, at *5 (D.S.C. Nov. 10, 2021) (finding insufficient allegations of intent in breach-of-contract case not involving misappropriation of trade secrets or unlawful creation of competitive entity); *compare also Jinks v. Sea Pines Resort, LLC*, 2021 WL 4711408, at *1–2 (D.S.C. Oct. 8, 2021) (finding insufficient allegations of intent in action concerning vote of community association).  Rather, the Verified Complaint alleges that TKI knowingly coordinated with employees of Steves bound by non-competition covenants to "milk" an "opportunity" and "pick it all" using trade secrets misappropriated from Steves by TKI's co-conspirators.  (Ver. Compl. ¶¶ 47, 54 ("At the time Taimur Khan of TKI sent this message, both

Allen and Copeland were still employed by Steves . . . and had active non-compete, non-solicitation, and confidentiality agreements.").)  In TKI's own words, its plan was "to remain underwater . . . a happy smil[e]y friendly submarine . . . good with everyone . . . **but carry a mean nuclear war head**."  (*Id.* ¶ 54 (emphasis altered).)  TKI even undertook to help its co-conspirators' deception of Steves by providing them with TKI-owned email addresses.  (*Id.*)  As the Verified Complaint alleges, such activity "show[s] that TKI was aware of the Defendants' nefarious efforts to start a competing business and that TKI was involved in trying to cover up the Defendants' actions."  (*Id.*)  Of course, *any* business making *any* business decision hopes to increase its profits—and such decisions commonly cause certain "incidental harm to competitors that is necessarily part of all legitimate business competition."  *Waldrep Bros. Beauty Supp.*, 992 F.2d at 63.  But TKI's conduct here is not simply "a fact of life in a market economy," *id.*; rather, TKI's unlawful and conspiratorial conduct suggests that its immediate and primary purpose for engaging in the conspiracy was to hurt Steves.  *See Benedict Coll.*, 400 S.C. at 735 S.E.2d at 522; *Lee*, 289 S.C. at 9, 344 S.E.2d at 381; *Nelson Mullins Riley & Scarborough, LLP v. Aon Risk Servs. of New York*, 2008 WL 3049850, at *8 (D.S.C. July 18, 2008) (denying summary judgment of plaintiff's claim for civil conspiracy).

TKI further contends that Steves has not established *prima facie* that TKI was "aware that KoraDoor was going to be used as a vehicle to profit from [Steves]'s trade secrets."  (Motion 14.)   TKI then lobs factual issues at the Verified Complaint—contending that Steves's allegations are "inaccurate" (*id.*) and thus ignoring this Court's requirement to draw all factual ambiguities in favor of Steves.  *See Universal Leather*, 773 F.3d at 558 ("In considering whether the plaintiff has met this burden, the district court 'must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable

25

inferences for the existence of jurisdiction.'" (citation omitted)).  Steves alleges that the text thread between TKI and its two co-conspirators (then still Steves employees) concerns their plan to deceive Steves's Co-Chairman of the Board of Directors (Sam Steves, called "Uncle Sam" in the texts), to steal Steves's trade secrets, and to unlawfully start a competing business.  (Ver. Compl. ¶ 54.)  TKI offers a different interpretation of these messages.  (Motion 14.)  That interpretation, however, is irrelevant at the pleading stage.  Regardless, Steves also pleads that TKI undertook to create TKI emails for its co-conspirators so that they could conceal their efforts from Steves.  (Ver. Compl. ¶ 54.)  TKI does not deny that it offered to do so, but simply contends that this offering ultimately never materialized (Motion 14)—a distinction irrelevant to this Court's exercise of conspiracy jurisdiction over TKI.  At this stage, the court must resolve these and all other factual disputes in Steves's favor.

To the extent that this Court does not find that Steves has met its burden at this stage, Steves respectfully requests the opportunity for jurisdictional discovery into TKI's motivations, intentions, communications, and plans related to the entity ultimately named KoraDoor and TKI's arrangements with the other defendants regarding the conspiracy claim.  *See Scardino*, 2014 WL 12606303, at *2.

## B.  Steves Has Adequately Pleaded Claims against TKI for Misappropriation of Trade Secrets and Civil Conspiracy.

TKI also argues that Steves has failed to state claims against it for misappropriation of trade secrets and for civil conspiracy.[11]  TKI's arguments are meritless.  Steves has satisfactorily pleaded these claims against Steves.

---

[11] Tellingly, TKI does not challenge the sufficiency of Steve's claims against it for tortious interference with a contractual relationship, aiding and abetting a breach of fiduciary duty, or unjust enrichment.  (*See* Ver. Compl. ¶¶ 131–37, 151–57, 168–71.)

### 1. Misappropriation of Trade Secrets

TKI contends that Steves "has failed to plausibly allege that TKI misappropriated any of the alleged trade secrets." (Motion 15.) Under the federal Defend Trade Secrets Act and the South Carolina Trade Secrets Act, "an owner of a trade secret that is misappropriated may bring a civil action for damages or injunctive relief if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." *Boon Ins. Agency, Inc. v. Lloyd*, 2020 WL 5052956, at *4 (D.S.C. Aug. 27, 2020) (cleaned up) (quoting 18 U.S.C. § 1836(b)(1), (3)(A)–(B)); *see id.* (analyzing federal and state statutory claims together "[g]iven the similarity in the elements for claims brought under [them]"). "To bring a claim under the DTSA, a plaintiff must establish: '(1) it owns a trade secret; (2) the trade secret was misappropriated; and (3) the trade secret implicates interstate or foreign commerce.'" *Id.* (quoting *Space Syss./Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 853 (E.D. Va. 2018)).

Steves has satisfactorily pleaded that it owns multiple trade secrets (*i.e.*, "customer-specific pricing, pricing strategies, supply agreements, market strategies, growth strategies, material costs and suppliers, strategic plans . . . [involving] molded door skins, and specific specifications of Steves plans to manufacture molded door skins," Ver. Compl. ¶ 33),[12] and that this claim implicates interstate commerce between parties from South Carolina, Texas, North Carolina, and Georgia (*id.* ¶¶ 1–7, 94–95). Indeed, TKI's Motion never challenges these elements of Steves's trade secret claim.

Rather, TKI contends that Steves has not plausibly "allege[d] that TKI misappropriated any of the alleged trade secrets." (Motion 15.) In doing so, TKI disregards the plain language of the federal Defend Trade Secrets Act and the South Carolina Trade Secrets Act. Those acts

---

[12] *See, e.g.*, *Prysmian Cables & Sys. USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1037 (D.S.C. 2021) (finding similar material entitled to trade secret protection and collecting cases).

define misappropriation broadly—including not just "use" of a trade secret but the mere "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. §1839(5)(A); S.C. Code Ann. § 39-8-20(2)(b). As TKI acknowledges, Steves's Verified Complaint "details how Copeland and Allen used their access to acquire various alleged trade secrets and states that '[they] and the other Defendants *used* these trade secrets to set up KoraDoor . . . ,' and further that . . . TKI [and other defendants] *knew* the information that Copeland and Allen misappropriated and *provided* to them were trade secrets . . . ."[13] (Motion 15–16 (emphasis added and altered).) Thus, in pleading that TKI acquired trade secrets from Copeland's and Allen's plainly improper misappropriation from Steves (a fact easily discernible by and in fact known to TKI), Steves satisfactorily pleads misappropriation under the DTSA and SCTSA. *See* 18 U.S.C. §1839(5)(A); S.C. Code Ann. § 39-8-20(2)(b).

Disregarding the expansive statutory definitions of "misappropriation," TKI simply insists that it never "used" Steves's trade secrets and that Steves's allegation of as much "makes little sense." (Motion 16.) But even this argument fails—as it too rests upon TKI's construal of the facts. Steves's Verified Complaint pleads that TKI is a supplier in the door market[14] (Ver. Compl. ¶ 7) and that the trade secrets misappropriated by Defendants "includ[ed] pricing for individual door styles, minimum volumes, rebates, and other key terms"—*i.e.*, sensitive negotiating information, the disclosure of which "would harm Steves economically by diminishing Steves' negotiating ability" in the market. (*Id.* ¶¶ 21–22.) The Verified Complaint

---

[13] TKI states that it "was never provided with any trade secret information." (Motion 3 (citing Decl. Taimur Khan ¶¶15–16, ECF No. 18-1).) Once again, this attempt to create an issue of fact is immaterial, because the court must construe factual disputes in Steves's favor at this stage.

[14] In fact, TKI is not just a supplier but a direct competitor to Steves with respect to certain products and portions of the market.

also alleges that TKI used Steves's trade secrets once provided to it. (*E.g.*, *id.* ¶ 101.) Thus, not only does Steves sufficiently plead that TKI used its misappropriated trade secrets, but Steves specifically pleads "why it would do so." (*Compare* Motion 16.)

### 2. Civil Conspiracy

TKI also contends that Steves "has failed to make a plausible claim that TKI participated in the alleged conspiracy." (Motion 17.) For the reasons set forth above in Section IV.A.2, which Steves hereby incorporates as though fully set forth again here, Steves has satisfactorily pled a claim of civil conspiracy against TKI.

## V. CONCLUSION

This Court should deny TKI's Motion for the foregoing reasons. This Court has specific jurisdiction over TKI for Steves's claims in this action, and Steves has adequately pleaded claims for both misappropriation of trade secrets and civil conspiracy against TKI.

February 7, 2025

Respectfully submitted,

By: /s/ *Wesley T. Moran*

**NELSON MULLINS RILEY & SCARBOROUGH LLP**
G. Mark Phillips
Federal Bar No. 3051
151 Meeting Street, Suite 600
Post Office Box 1806 (29402-1806)
Charleston, SC 29401-2239
Phone: (843) 853 - 5200
Email: mark.phillips@nelsonmullins.com

Wesley T. Moran
Federal Bar No. 12797
3751 Robert M Grissom Parkway
Myrtle Beach, South Carolina 29577-6412
Phone: (843) 946-5600
Fax: (843) 448-3437

Email: wes.moran@nelsonmullins.com

Axton D. Crolley
Federal Bar No. 13454
1320 Main Street, 17th Floor
Columbia, SC 29201
Phone: (803)-255-9433
Fax: (803)-256-7500
Email: axton.crolley@nelsonmullins.com

**FORD MURRAY, PLLC**
William H. Ford (to be admitted pro hac vice)
bill.ford@fordmurray.com
Veronica S. Wolfe (to be admitted pro hac vice)
veronica.wolfe@fordmurray.com
Kennedy Hatfield Asel (to be admitted pro hac vice)
hatsfield.asel@fordmurray.com
10001 Reunion Place, Suite 640
San Antonio, Texas 78216
Phone: (210) 731-6400

**HUNTON & WILLIAMS LLP**
Maya M. Eckstein (to be admitted pro hac vice)
meckstein@HuntonAK.com
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Phone: (804) 788-8200

*Attorneys for Plaintiff*

**PIPKIN LAW**
Marvin G. Pipkin
10001 Reunion Place, Suite 6400
San Antonio, TX 78216
Telephone: (210) 731-6495

*Of Counsel to Plaintiff*